**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND**
**(NORTHERN DIVISION)**

| | |
|---|---|
| **SIRIUS SIGNAL, L.L.C.,**<br><br>       **Plaintiff**<br><br>       **v.**<br><br>**WEEMS & PLATH, LLC,**<br><br>       **Defendant** | **Case No. 1:19-cv-02330-RDB** |
| **WEEMS & PLATH, LLC,**<br><br>       **Defendant/Counter-Plaintiff/Third-Party Plaintiff,**<br><br>       **v.**<br><br>**SIRIUS SIGNAL, L.L.C.,**<br><br>       **Plaintiff/Counter-Defendant,**<br><br>**and**<br><br>**ANTHONY COVELLI,**<br><br>       **Third-Party Defendant.** | |

**DEFENDANT WEEMS & PLATH, LLC'S FIRST AMENDED COUNTER-COMPLAINT**
**AND FIRST AMENDED THIRD-PARTY COMPLAINT**
**AGAINST ANTHONY COVELLI; AND JURY DEMAND**

Defendant Weems & Plath, LLC ("W&P"), by and through undersigned counsel, submits

this First Amended Counter-Complaint in response to the Complaint filed by Sirius Signal,

L.L.C. ("Sirius"), and this First Amended Third-Party Complaint against Anthony Covelli

("Covelli"), and states for cause the following:

## AMENDED COUNTER-COMPLAINT

Defendant/Counter-Plaintiff Weems & Plath, LLC ("W&P," "Defendant," or "Counter-Plaintiff"), by and through its undersigned counsel, hereby asserts the following Counter-Complaint against Plaintiff/Counter-Defendant Sirius Signal, L.L.C. ("Sirius," "Plaintiff," or "Counter-Defendant"), and states for cause as follows:

### Parties

1.      Counter-Plaintiff W&P is a Maryland limited liability company with its principal place of business at 214 Eastern Avenue, Annapolis, Maryland 21403.  The sole member of Weems & Plath, LLC is a citizen of New Jersey.  W&P's predecessor-in-interest, Weems & Plath, Inc., was a Maryland corporation.

2.      On information and belief, Counter-Defendant Sirius is a limited liability company organized under the laws of the State of California with its principal place of business located in the State of California.  All members of Sirius Signal, L.L.C. are citizens of California. Although Sirius Signal, L.L.C. has represented itself at times as a corporation (e.g., "Sirius Signal, Inc.") in related documents, no such corporation is known to exist, and Sirius's representation as such appears to be false, both as a matter of fact and as a matter of law.

3.      This Court has subject matter jurisdiction over W&P's counterclaims pursuant to 28 U.S.C. § 1332 because the Parties are diverse and the amount in controversy exceeds $75,000. W&P is a citizen of Maryland as it is a Maryland limited liability company, and W&P's member is a citizen of New Jersey.  Sirius is a citizen of California as it is a California limited liability company, and Sirius's members are citizens of California.

4.      This Court has personal jurisdiction over Sirius pursuant to federal principles of due process and to Maryland Code, Courts and Judicial Proceedings section 6-103(b)(4)

2

(Maryland's "Long Arm Statute" at MD Cts & Jud Pro Code § 6-103 (2018)), because Sirius has purposefully availed itself of this Court by filing this action before this Court, Sirius has purposefully availed itself of this District by entering into a contract with a Maryland company in which Sirius agreed to be governed by Maryland law, the counterclaims arise out of Sirius's dealings with the Maryland company, and through the actions described below, Sirius has caused tortious injury in Maryland to the Maryland company.

### Venue

5.      Venue is proper in this district pursuant to 28 U.S.C. § 1367 because Plaintiff/Counter-Defendant brought its claims before this Court, thereby consenting to venue and waiving any objection to venue, and the counterclaims forms part of the same case or controversy as Plaintiff/Counter-Defendant's claims.

### Facts

6.      W&P incorporates all allegations from the Complaint admitted by W&P as if set forth herein.

7.      W&P has been a leader in nautical instruments since 1928.  W&P is the assignee and successor-in-interest of Weems & Plath, Inc., the named party to the Agreement with Sirius and related Amendments, which were executed on behalf of Weems & Plath, Inc., by Peter Trogdon, the former president of Weems & Plath, Inc.

8.      One of the founders of W&P, Captain Phillip Van Horn Weems, taught at the U.S. Naval Academy in Annapolis, Maryland, and then established his own school to teach the Weems System of Navigation. Charles Lindbergh studied with Captain Weems before attempting his trans-Atlantic flight. Rear Admiral Richard Evelyn Byrd Jr., a classmate of

Weems at the Naval Academy, came to Weems for instruction, as did many others, before setting out for the North Pole.

9.      The other founder of W&P, Carl Plath, developed the first gyrocompass to be installed in a commercial vessel.  Capt. Weems and Mr. Plath teamed up in 1928 to form W&P in Annapolis, where it is still located today.

10.     Over the years, W&P has developed strong goodwill in the nautical community.

11.     On December 31, 2015, W&P and Sirius entered into a contract (the "Agreement," attached as Exhibit A) for distribution of certain electronic marine distress signaling devices, which W&P believed were patented devices, whereby W&P would have an exclusive license to manufacture, distribute, advertise, publicize, market and sell the Licensed Products (as defined below) (the "License") in exchange for W&P making a substantial upfront payment to Sirius and paying ongoing royalties to Sirius on sales of the Licensed Products.

12.     This cooperation was to benefit both parties, since W&P had at that time, and still maintains, a solid reputation and goodwill in the marketplace, and an established network of distribution channels.

13.     During negotiation of the Agreement, Covelli knowingly misrepresented that the product to be licensed and sold pursuant to the Agreement, the C-1001, was patented, in order to induce W&P to execute and perform the Agreement, including W&P making payment of a substantial upfront fee and ongoing royalties for related sales of the Licensed Products.  Covelli also knowingly directed W&P to falsely mark the products with the numbers of patents that did not cover the product.  Covelli also knowingly misrepresented that the Patents were valid and enforceable and failed to inform W&P that the Patents had been fraudulently obtained and that Covelli and his co-inventor, Simons, intentionally withheld information from the U.S.P.T.O.

4

during prosecution of the Patents in violation of the oaths signed by, and submitted to the U.S.P.T.O., by Covelli and Simons.

14.     The Parties executed three amendments to the Agreement (i.e., the First Amendment executed February 8, 2016; the [Second] Amendment made March 10, 2016; and the Third Amendment made August 18, 2017).  During the term of the Agreement, Covelli and/or Simons intentionally misrepresented to W&P the ownership of at least a portion of the Patents.

15.     "Know-How" is defined in the Agreement, as amended, to "have its usual and accepted meaning such as, by way of example, but not of limitation, all factual knowledge, proprietary information, trade secrets, procedures, processes, methods, designs, discoveries, inventions, patent application, licenses, software and source code, programs, prototypes, techniques, ideas, concepts, data, engineering, manufacturing information, techniques, ideas, concepts, data, engineering, manufacturing information, specifications, diagrams, schematics, or rights or works of authorship, that give to the one acquiring it an ability to study, test, produce, formulate, manufacture or market the SOS Distress Light SOS A-1001 sold by Sirius or variations thereof, which one otherwise would not have known how to study, test, produce, formulate, manufacture or market in the same way."

16.     "Licensed Products" are defined in the Agreement, as amended, to include, *inter alia*, "[a]ny product made, used, sold, imported or offered for sale that includes or is covered by any of the Patents or Know How."

17.     "Patents" are as defined in the Agreement, as amended, and include*, inter alia,* "(b) all current and future patents related to the SOS Distress Light SOS A-1001 sold by Sirius or variations thereof that may be granted thereon [and] (c) any future patents and/or patent

applications owned by Sirius and covering one or more aspects of the SOS Distress Light SOS A-1001 sold by Sirius as of December 30, 2015 or variations thereof."

18.     Because selling the Licensed Products would require substantial investment by W&P in developing and marketing the product and developing the product-specific distribution channels, the Agreement was intended to be renewed through the life of the Patents. The Third Amendment states that the Agreement "will automatically renew" unless intentionally terminated and only then, after a "mandated negotiation."

19.     W&P spent substantial resources in this development and marketing necessary to manufacture and sell the Licensed Products.

20.     Although the Agreement is written in terms of the model A-1001 light, the only Licensed Product sold under the Agreement thus far has been the model C-1001 light.

21.     The Agreement is currently in its second two-year term.

22.     In the spring of 2019, the Parties began discussing a Fourth Amendment to the Agreement.

23.     During these discussions, Sirius asked W&P to license a new multi-color light with another substantial upfront payment, as well as future ongoing royalties based on sales of the multi-colored light, and the Parties agreed to address the new multi-color light after negotiating the Fourth Amendment.

24.     After productive negotiations in which the Parties agreed on all material terms of the Fourth Amendment, Sirius refused to sign the Fourth Amendment unless W&P licensed the new multi-color product from Sirius, which license included the additional substantial upfront licensing fee, among other terms potentially onerous to W&P.

25.     Despite W&P's repeated requests, Sirius refused to provide W&P with pertinent information pertaining to the new multi-color light or license arrangement that would be sufficient for W&P to make an informed and responsible decision as to the viability of licensing the new multi-color light or even the necessity of negotiating a new license for the multi-color-light product since this light is a Licensed Product under the Agreement.

26.     On June 26, 2019, Anthony Covelli, member and CEO of Sirius, sent a letter to W&P declaring that it had chosen not to renew the Agreement (the "First Declaration of Intent to End Agreement"). There was no mention by Sirius of any alleged breach of the Agreement by W&P in the First Notice of Intent to End Agreement.

27.     On July 26, 2019, Anthony Covelli, member and CEO of Sirius, wrote another letter to Michael Flanagan, President and CEO of W&P, alleging that (a) W&P had breached the Agreement and (b) the Agreement would terminate on August 25, 2019 (the "Second Declaration of Intent to End Agreement"). The July 26, 2019 letter was the first time Covelli or Sirius had told W&P that Covelli or Sirius considered W&P in breach of the Agreement.

## Count I – Breach of Contract by Sirius

28.     W&P repeats and re-alleges each of the foregoing allegations as though fully set forth herein.

29.     The Parties, for valuable consideration, entered into an Agreement on December 31, 2015 (with three subsequent amendments) to grant W&P "an exclusive license … in and to the Know-How with respect to the Patents and the Trademarks to manufacture, distribute, advertise, publicize, market and sell Licensed Products to consumers and retail entities" in return for a substantial upfront payment and ongoing royalty payments by W&P to Sirius.

30.     As set forth herein with reference to specific sections of the Agreement, Sirius has breached numerous provisions of the Agreement, causing damage to W&P financially and non-monetarily including, at a minimum, reputationally.  Breaches have included, *inter alia*, that: (1) Sirius failed to provide proper notice of breach with at least a 30-day cure period under and in breach of Section 10; (2) Sirius sought to terminate the Agreement prior to any determination of whether alleged breaches were cured, also under and in breach of Section 10; and (3) Sirius failed under and in breach of Section 8c to "take diligent steps, including, but not limited to, filing a lawsuit or injunction if necessary, to protect and defend Sirius's rights to the Patents" against potential infringement by Orion Safety Products, in the event that Orion's products do in fact infringe the Patents as Sirius has represented to W&P.

### Breach of Implied Covenant of Good Faith and Fair Dealing of the Agreement

31.     Sirius has breached an implied covenant of good faith and fair dealing by knowingly misrepresenting that the product to be licensed and sold pursuant to the Agreement, the C-1001, was patented, in order to induce W&P to execute and perform the Agreement, including W&P making payment of a substantial upfront fee and ongoing royalties for related sales of the Licensed Products.

32.     Sirius has breached an implied covenant of good faith and fair dealing by knowingly misrepresenting that patents obtained, owned, and/or claimed to be owned by Sirius were valid when, in fact, it knew that they were invalid due to fraud, inequitable conduct, and violation of the duty to disclose material art to the USPTO.

33.     Sirius has breached an implied covenant of good faith and fair dealing by threatening to not renew the Agreement if W&P did not license a new, multi-colored light and pay a significant upfront payment of $275,000 (in addition to the initial upfront payment of

$200,000 when the parties signed the Agreement effective December 31, 2015). Assuming arguendo that Sirius's claim is correct that the multi-color light is not a Licensed Product covered under the Agreement, Sirius breached its duty of good faith and fair dealing regarding the Agreement by improperly attempting to tie continuation of the existing Agreement to W&P's acceptance of the newly-proposed license agreement to the multi-colored light. Nothing in the Agreement requires W&P to license new products as a condition to continuing to license the existing products.

34.     Conversely, assuming, as W&P does, that that the multi-color light is a Licensed Product covered under the Agreement, Sirius breached its duty of good faith and fair dealing regarding the Agreement by improperly attempting to tie continuation of the existing Agreement to W&P's acceptance of the newly-proposed, unnecessary, and exorbitant license agreement to the multi-colored light, for which W&P already has a license under the Agreement. Beyond improperly attempting to tie continuation of the Agreement to acceptance of the unnecessary license, Sirius's demand that W&P pay an extra exorbitant upfront fee to license the new multi-color light is in breach of good faith and fair dealing, because the multi-colored light falls under the definition of Licensed Products, is thus already part of W&P's License, for which a previous upfront fee already had been paid, and pursuant to which royalties on sales of the multi-colored light would accrue on behalf of Sirius just as sales of the existing products do already.

35.     Sirius has also breached an implied covenant of good faith and fair dealing by fabricating the unsubstantiated claim that W&P breached the Agreement as a basis for its Second Declaration of Intent to End Agreement. Sirius only made this claim after Sirius realized Sirius had no legal justification for the First Declaration of Intent to End Agreement since the First Declaration of Intent to End Agreement was sent to W&P only after and because W&P declined

to accept Sirius's demands that W&P enter into a separate license agreement for the new multi-color light and pay an enormous upfront fee, which was never discussed or contemplated when the Agreement was executed in December 2015 and is not a valid basis for refusing to renew the Agreement.

**Breach of Section 2 of the Agreement**

36.     Under Section 2a of the Agreement (listed as Section 3 in the First Amendment to the Agreement, but still referred to as Section 2 within the amended section), W&P has the exclusive right to "manufacture, distribute, advertise, publicize, market, sell, offer for sale and/or import Licensed Products." ("W&P's Exclusive Rights").

37.     In breach of W&P's Exclusive Rights under the Agreement, prior to August 25, 2019, Sirius undertook activities to manufacture the Licensed Products by Sirius having ordered floats from one of W&P's suppliers, Pan-U Industries Co. Ltd, for use in Sirius's manufacturing of the Licensed Products.

38.     In further breach of W&P's Exclusive Rights by Sirius in furtherance of Sirius's manufacturing activities, prior to August 25, 2019, Sirius contacted third parties, including but not limited to W&P's manufacturer of circuit boards for the Licensed Products, EMLinQ LLC ("EMLinQ"), to manufacture components of the Licensed Products for Sirius, for use in Sirius's manufacturing of the Licensed Products and, without authorization from W&P, allowed EMLinQ to charge the cost of the shipping for same to W&P.

39.     In further breach of W&P's Exclusive Rights by Sirius under the Agreement, Sirius has been marketing Sirius-manufactured Licensed Products to at least one of W&P's customers, including a major marine retailer (hereinafter referred to as "Customer A"), in an attempt to divert sales from W&P to Sirius and make direct sales to Customer A of Licensed

Products not purchased from W&P for resale.  Customer A is representative of W&P's customers similarly impacted by Sirius's and Covelli's activities, which have put W&P's customers in the middle of the dispute with Sirius and Covelli, thereby damaging W&P's goodwill and reputation.

40.     In further breach of W&P's Exclusive Rights by Sirius under the Agreement, on August 26, 2019, Sirius published a press release announcing, "the upcoming launch of its dual color eVDSD model C-1002 device and the updated C-1003 model, both of which will be manufactured and distributed exclusively by Sirius Signal." The press release continues that these models "are currently undergoing testing and certification."

41.     The C-1002 and C-1003 devices are Licensed Products in accordance with the terms of the Agreement.

42.     In further breach of W&P's Exclusive Rights by Sirius under the Agreement, Sirius is currently offering these new Sirius-manufactured products for sale.  Moreover, Sirius is disparaging the Licensed Products sold by W&P insofar as Sirius is marketing the new model C-1003 as a replacement that "promises to be vastly more effective than the current white light models" comprising the C-1001 sold by W&P, implying that the W&P product is outdated, inferior, and less effective.  Even if the Agreement is deemed to have an early termination date, these statements affect the ability of W&P to sellout its inventory as per the terms of the Agreement.

43.     Section 2a of the Agreement also states that "Sirius shall in a timely manner make available to W&P such materials as may be necessary or desirable for use in exercising W&P's rights hereunder."

11

44.     In breach of these express terms of Section 2a of the Agreement, in an attempt to frustrate W&P's ability to manufacture the products, Sirius has refused, and continues to refuse, to provide manufacturing specifications for the Licensed Products to W&P, including, but not limited to, circuit board design specifications, known as "Gerber" files, which are necessary to manufacture the circuit boards.

**Breach of Section 3 of the Agreement**

45.     Section 3 of the Agreement states, in part, that "[t]he parties agree to renew for additional twenty-four (24) month periods thereafter … unless one party after a mandated negotiation at the end of the prior term gives the other party sixty (60) days' notice to terminate the Agreement. In this way, the License could be for the life of the patents…."

46.     The Agreement was amended in Section D of the Third Amendment to state that the Agreement "will automatically renew" unless intentionally terminated by 60-days' notice and only then, after a "mandated negotiation."  Section 2 of the Third Amendment states that "prior to renewal of a 'Term' in Section 3 under the Agreement, in order to terminate the 'Initial Term' or a 'Renewal Term', the 'mandated negotiation' prior to the termination must occur at least sixty (60) days prior to the end of the 'Term', and each party must give the other party sixty (60) days [sic] notice to terminate the 'Term' prior to the end of each 'Term', unless agreed by the parties in writing."

47.     In breach of these express terms of the Agreement, Sirius violated Section 3 of the Agreement by not performing the required "mandated negotiation" prior to declaring the termination of the Agreement.

**Breach of Section 5 of the Agreement**

48.     Section 5 of the Agreement states that "Sirius will not license to any party other than W&P, to manufacture, sell or distribute any products that perform the same or a substantially similar function as the Licensed Products."

49.     In breach of Sirius's obligations under Section 5, Sirius negotiated with at least one third party, Orion Safety Products ("Orion"), to license its patents to Orion.

50.     In breach of Sirius's obligations under Section 5, Sirius negotiated with at least Orion to manufacture the new multi-colored light.

51.     In breach of Sirius's obligations under Section 5, Sirius gave at least Orion an implied license to sell Licensed Products by not enforcing the patents against Orion or any other infringing third party.

52.     In breach of these express terms of the Agreement, Sirius has thus licensed rights to manufacture and sell the Licensed Products to at least Orion and has not decreased the cost paid by W&P to Sirius despite the fact that W&P now has a non-exclusive license to manufacture and sell the Licensed Products.

**Breach of Section 6 of the Agreement**

53.     Section 6 of the Agreement gives W&P a right of first offer to any new technologies or products developed by Sirius that are not Licensed Products.

54.     Section 6 of the Agreement states:

> Right of First Offer; Notice of Sale.   If at any time during the Term and for a period of one (1) year thereafter, (i) Sirius shall desire to sell, transfer, assign or otherwise convey, whether in whole or in part, the Know-How related to the Licensed Products, or … (iii) Sirius shall desire to grant licenses for other technologies, patents, trademarks, or products that it may from time to time develop, Sirius agrees that it shall provide W&P with sufficient notice of any such sale or licensing opportunity to permit W&P to enter into discussions with Sirius

13

concerning such opportunity and Sirius further agrees that it shall in
good faith review any reasonably written offer by W&P concerning any
such opportunity. The terms of this Section 7 [sic] shall survive the
expiration or earlier termination of this Agreement.

55.     Upon information and belief, Sirius negotiated with Orion prior to May 2018 to

make the multi-colored light, about a year before offering to W&P the opportunity to make the

multi-colored light.  If for any reason the multi-colored light is not considered to be a Licensed

Product, then Sirius is in breach of the express terms of the Agreement, because Sirius negotiated

with at least Orion to license, implicitly or explicitly, the new, multi-colored light without first

offering such opportunity to W&P.  Even when Sirius eventually did offer the new product to

W&P, Sirius did so without providing support for projected sales or other material information,

such as estimated manufacturing costs, which would be critical for W&P to make an informed

decision.  Sirius then retracted the offer while refusing to provide the additional information,

thereby further depriving W&P of its right of first offer.

56.     Upon information and belief, in breach of the express terms of the Agreement,

Sirius negotiated with at least Orion to license, implicitly or explicitly, certain Know How

without first offering such opportunities to W&P.

**Breach of Section 8(c) of the Agreement**

57.     Section 8c of the Agreement obligates Sirius to take diligent steps to enforce the

Patents against third parties.

58.     Section 8c of the Agreement states, in part:

Defense of Patents and Trademarks.  In the event either party becomes
aware of any infringement by a third party of the Patents or Trademarks,
Sirius shall, at its sole cost and discretion, take diligent steps, including,
but not limited to, filing a lawsuit or injunction if necessary, to protect
and defend Sirius's rights to the Patents and trademarks.

59.     Upon information and belief, at least Orion is selling a product that Sirius indicates infringes at least one claim of one of the Patents.

60.     Orion's purported infringement of the Licensed Patents has been ongoing since on or about May 2018.

61.     W&P notified Sirius that such infringement has caused, and continues to cause, financial harm to W&P.

62.     W&P put Sirius on notice of the financial damage caused by Orion's purported infringement at least as early as October 2018.  To the extent that Sirius was involved with Orion commencing such purported infringement, Sirius was on notice of Orion's purported infringement since as early as Orion commenced the purported infringement before May 2018.

63.     Upon information and belief, and in breach of the express terms of the Agreement, Sirius has not "take[n] diligent steps, including, but not limited to, filing a lawsuit or injunction if necessary," or even sent a cease and desist letter to Orion or any other third party demanding that they stop infringing the Licensed Patents.

64.     In breach of the express terms of the Agreement, Sirius has not brought a lawsuit against Orion or any other third party to prevent them from infringing the Licensed Patents.

65.     One of the benefits of the Agreement obtained by W&P in exchange for substantial royalty payments and a substantial upfront payment commensurate with an exclusive right is the exclusive right to manufacture, distribute, advertise, publicize, market, and sell the Licensed Products.

66.     Section 2a of the Agreement states that "Sirius understands and agrees that the representations and warranties set forth in this Section 2(a) are a material inducement to W&P entering into this Agreement."

67.     W&P has been and will continue to be damaged financially, and be put at an ongoing serious disadvantage financially, by Sirius not enforcing the Patents against third parties, including Orion, due to lost sales to the infringing parties.

68.     To the contrary, in clear breach of Sections 2a and 8c of the Agreement, Sirius is actively encouraging at least Orion to infringe the Patents by attempting to license the Patents to Orion.

69.     Sirius's failure to "take diligent steps … to protect and defend Sirius's rights to the Patents" to the clear disadvantage of W&P also breaches Sirius's duty of good faith and fair dealing.

<u>**Breach of Section 10 of the Agreement**</u>

70.     Section 10 of the Agreement provides a minimum of a 30-day window to cure any breach to the Agreement.  The minimum window to cure is 30 days, except in the case that the breach "is not capable of reasonably being cured within thirty (30) days." In such instance, the time for cure "shall be extended as reasonably necessary provided the defaulting party commences to cure such default within thirty (30) days and diligently prosecutes the cure to completion."  Likewise, nowhere does the Agreement provide Sirius with the right to unilaterally terminate either: (1) based on Sirius's unilateral perception that an alleged breach is "incapable of being cured;" or (2) before at least 30 days of notice have passed and the alleged breach has not been cured or corrected or begun to be cured or corrected.

71.     In the Second Declaration of Intent to End Agreement, Sirius stated that W&P allegedly had breached of the Agreement by selling to a distributor in Finland the Licensed Products with a red light that does not conform to U.S. Coast Guard standards and by labeling these products with the same product number as those sold with a white light that does conform

to U.S. Coast Guard standards, despite the fact that Sirius, after extensive communications with W&P, approved the sale of this exact light to the Finish distributor.

72.     In the Second Declaration of Intent to End Agreement, Sirius first instructed W&P, in three enumerated commands, to "Take all steps necessary" to cure specified aspects of the alleged breach.  Immediately thereafter, Sirius illogically, and in contradiction to the three enumerated commands, asserted that "[b]y their very nature, these breaches of the agreement are incapable of being cured, much less cured within 30 days or within a reasonable time period." Sirius's own enumerated commands set forth how Sirius would propose to cure the alleged breaches, directly undermining and contradicting Sirius's claim that such "breaches of the agreement are incapable of being cured," clearly demonstrating, *inter alia*, Sirius's lack of good faith, in breach of Sirius's duty of good faith and fair dealing, and Sirius's breach of the cure provisions of Section 10.  Sirius's assertion of the unilateral discretion to deem an alleged breach to be "incapable of being cured" is itself a breach of the Agreement, as is Sirius's assertion that Sirius unilaterally may terminate the Agreement based on Sirius's perception of an alleged breach being "incapable of being cured."

73.     In addition to Sirius's breach of the Section 10 cure provisions, Sirius also fabricated the breach allegations by basing the unsupported allegations on illusory references to aspects of the Agreement.  In contradiction to Sirius's breach allegations, there is no express provision in the Agreement or in any other documentation that the Licensed Products are required to have a white light or to conform to U.S. Coast Guard standards.

74.     There also is no requirement in any of the Patents that the products described therein must have a white light or conform to U.S. Coast Guard standards.

75.     Furthermore, Sirius approved the Finnish Light prior to the shipment of the Finnish Light to Finland.

76.     Nevertheless, although not in breach of the Agreement, in a sign of good faith, W&P submitted a plan to Sirius to address Sirius's concerns within the thirty-day cure period.

77.     In breach of the express terms of Section 10 of the Agreement, through the Second Declaration of Intent to End Agreement and by way of filing the Complaint, Sirius is attempting to terminate the Agreement early, even though W&P had cured, or had commenced to cure, any alleged breach within 30 days of notification, and even though the breach allegations are not supported by any express terms of the Agreement, as no express terms of the Agreement were breached.

78.     W&P has complied with its obligations under the Agreement.  Nonetheless, Sirius has interfered with W&P's sales of the Finnish Light and W&P's relationships with W&P's customers purchasing the Finnish Light.

79.     Sirius's breach of contract has damaged or will damage W&P financially in an amount exceeding $75,000 and non-monetarily due to injury to its reputation and goodwill.

## **Count II – Unfair Competition by Sirius**

80.     W&P repeats and re-alleges each of the foregoing allegations as though fully set forth herein.

## **EMLinQ**

81.     EMLinQ is a circuit board manufacturer, from which W&P repeatedly has obtained circuits boards for use in the Licensed Products, and with which W&P has had an exclusive ongoing customer-supplier business relationship for nearly four years.  On July 16,

2019, W&P sent a purchase order to EMLinQ for 5,000 circuit boards for use in W&P

manufacturing the Licensed Products of the Agreement with Sirius.

82.     On July 29, 2019, EMLinQ informed W&P that EMLinQ had a call with Sirius

regarding the purchase order.

83.     In furtherance of Sirius's activities to manufacture the License Products, and in

breach of W&P's Exclusive Rights under the Agreement, Sirius placed an order with EMLinQ

for the same components that W&P had ordered from EMLinQ.

84.     On July 29, 2019, EMLinQ informed W&P that EMLinQ was "unable" (or

implicitly unwilling) to fulfill the W&P order, because of the influence exerted on EMLinQ by

Sirius and Covelli.

85.     Upon information and belief, the CEO of Sirius, Anthony Covelli, is a close

acquaintance of a representative of EMLinQ, and Mr. Covelli conspired with the EMLinQ

representative and exerted inappropriate influence on EMLinQ to interfere with W&P's order for

circuit boards for the Licensed Products.  Upon information and belief, Mr. Covelli and Sirius

committed unfair competition inasmuch as: (1) they made to EMLinQ statements that were

literally false and/or likely to mislead, confuse or deceive regarding W&P's rights to

manufacture the Licensed Products; and (2) Mr. Covelli's and Sirius's statements caused

commercial injury to W&P by harming W&P's ability to manufacture, and therefore sell, the

Licensed Products, including introducing inappropriate competition from Sirius in breach of

W&P's Exclusive Rights under the Agreement.

86.     Because of Mr. Covelli's false statements and inappropriate influence on

EMLinQ, EMLinQ permanently stopped supplying the circuit boards to W&P.  Separately,

Sirius placed orders with EMLinQ for the same or similar circuit boards for use in Sirius's

manufacturing of the Licensed Products, in breach of W&P's Exclusive Rights under the Agreement, which potentially tied up EMLinQ's supply capacity, interfered with W&P's business relations with EMLinQ, and frustrated W&P's ability to manufacture the Licensed Products.

87.     Without the circuit boards, W&P was unable to manufacture and sell the Licensed Products because it could not procure the circuit boards, and Sirius and Covelli further refused to provide to W&P the necessary information to allow another manufacturer to manufacture the boards for W&P in an additional attempt to frustrate W&P's ability to sell and manufacture the Licensed Products during a time period in which neither Party disputes that the Agreement was in effect.

**Customer A**

88.     W&P has been selling the Licensed Products to Customer A since around 2015. W&P has had business and contractual relations with Customer A since at least 2015, and W&P reasonably has an expectation of ongoing prospective business and contractual relations with Customer A.  Customer A is representative of W&P's customers similarly impacted by Sirius's and Covelli's activities, which have put W&P's customers in the middle of the dispute with Sirius and Covelli.

89.     Prior to August 25, 2019, Sirius falsely informed Customer A that Customer A would no longer be able to obtain the Licensed Products from W&P, and that Customer A would need to buy from Sirius the Licensed Products manufactured by Sirius.

90.     Sirius's assertion to Customer A is untrue.  Sirius's untrue comments to Customer A constitute fraud, deceit, trickery, bad faith, and/or unfair methods.  Upon information and belief, Mr. Covelli and Sirius committed unfair competition inasmuch as: (1) they made to

Customer A statements that were literally false and/or likely to mislead, confuse or deceive regarding W&P's rights to manufacture and/or sell the Licensed Products; and (2) Mr. Covelli's and Sirius's statements caused commercial injury to W&P by harming W&P's ability to manufacture and/or sell, the Licensed Products, including introducing inappropriate competition from Sirius in breach of W&P's Exclusive Rights under the Agreement.

91.     Section 11 of the Agreement states that: "Upon the termination or expiration of this Agreement for whatever reason, W&P … shall be able to continue to sell, on a non-exclusive basis, existing Licensed Products [in] inventory…."

92.     Sirius's actions caused at least Customer A to stop buying the Licensed Products from W&P, causing W&P to lose existing and future sales to Customer A of the Licensed Product.  Customer A has indicated to W&P that while Sirius disputes that W&P has the right to manufacture and sell the Licensed Products, Customer A will not buy the Licensed Products from W&P or anyone.  In addition, Sirius's filing of this lawsuit has interfered further with W&P's ability to manufacture and sell the Licensed Products even during the remainder of the existing term as some customers have refused to buy the Licensed Product until the litigation is resolved.

93.     Due to Sirius's untrue communications to at least Customer A and Customer A's reliance thereon, W&P's ability to sell the Licensed Products to at least Customer A has been impaired.

94.     Also due to Sirius's untrue communications to at least Customer A and Customer A's reliance thereon, W&P's ability to sell other products to at least Customer A has been jeopardized, because the inappropriate uncertainty caused by Sirius's untrue communications has undermined at least Customer A's faith in W&P as a supplier.

95.     Also due to Sirius's untrue communications to at least Customer A and Customer A's reliance thereon, W&P's reputation in the perspective of at least Customer A has been damaged, because Sirius's untrue communications have undermined at least Customer A's faith in W&P in general.

96.     Through the actions set forth above, Sirius has damaged, impaired, or jeopardized W&P's business through fraud, deceit, trickery, bad faith, and/or unfair methods.

**Count III – Tortious Interference with Business Relations/Expectancy by Sirius**

97.     W&P repeats and re-alleges each of the foregoing allegations as though fully set forth herein.

98.     The acts of Sirius described above with respect to EMLinQ were performed intentionally and were reasonably calculated to cause damages to W&P's business.  W&P has had ongoing business relations with EMLinQ, and but for Sirius's interference, W&P has had a reasonable probability of ongoing and future business opportunities with EMLinQ.

99.     The acts of Sirius described above with respect to EMLinQ were done with the unlawful purpose to cause damage and loss to W&P, without right or justifiable cause.

100.    W&P has been damaged financially and reputationally from the acts of Sirius described above with respect to EMLinQ.

101.    The acts of Sirius described above with respect to Customer A were performed intentionally and were reasonably calculated to cause damages to W&P's business.  W&P has had ongoing business relations with Customer A, and but for Sirius's interference, W&P has had a reasonable probability of ongoing and future business opportunities with Customer A.

102.    The acts of Sirius described above with respect to Customer A were done with the unlawful purpose to cause damage and loss, without right or justifiable cause.

103.    W&P has been damaged financially and reputationally from the acts of Sirius described above with respect to Customer A.

104.    Sirius's actions with respect to EMLinQ and Customer A were wrongful or unlawful, because they frustrated W&P's ability to perform W&P's Exclusive Rights under, and obtain the benefit of, the Agreement, and they breached an implied covenant of good faith and fair dealing.

105.    Sirius's actions with respect to Customer A were additionally wrongful or unlawful because they breached Section 2 of the Agreement by (1) Sirius violating W&P's exclusive license to advertise, publicize, market or sell the Licensed Products to Customer A, and by (2) Sirius attempting to advertise, publicize, market or sell to Customer A Licensed Products not purchased from W&P for resale.

106.    Sirius's actions intentionally have interfered tortiously with W&P's business and contractual relations with EMLinQ and Customer A.  Sirius's actions intentionally have interfered tortiously with W&P's prospective business advantage with at least Customer A. Namely, Sirius's actions have proximately caused W&P's ability to manufacture and sell the Licensed Products to decrease, and have damaged W&P at least in terms of lost current and future sales, decreased product turnover, and associated decreased profits.  As a result of Sirius's tortious interference, W&P has been damaged financially and reputationally in W&P's existing and prospective business relationships with at least EMLinQ, and Customer A.

107.    Sirius committed tortious interference with W&P's business relations inasmuch as (1) W&P had beneficial business relations with at least Customer A and EMLinQ, (2) Sirius knew of W&P's beneficial business relations, (3) Sirius intended to impair or cause a detriment to W&P's business relations, (4) Sirius lacked any privilege to impair or cause a detriment to

23

W&P's business relations, (5) Sirius impaired or caused a detriment to W&P's business

relations, and (6) Sirius's actions caused damage to W&P.

### Count IV – Civil Conspiracy by Sirius

108.    W&P repeats and re-alleges each of the foregoing allegations as though fully set

forth herein.

109.    Upon information and belief, Sirius Signal, L.L.C. was formed by Anthony W.

Covelli and Robert B. Simons, Jr. ("Simons"), in California on March 05, 2015, and identified as

entity 201506810315.

110.    Upon information and belief, no legal entity possibly associated with Sirius is

known to have existed prior the formation of Sirius Signal, L.L.C. on March 05, 2015.

111.    Upon information and belief, Sirius Signal, L.L.C. has as members, *inter alia,*

Covelli and Simons, who are the co-inventors listed on Patents covered in the Agreement

executed by Covelli on behalf of Sirius Signal, L.L.C.

112.    Upon information and belief, co-inventors Covelli and Simons claim to have

created the initial devices and initial technology associated with the Patents and patent

applications, the earliest of which was filed June 6, 2014, at least nine months before the

formation of Sirius Signal, L.L.C. as a legal entity on March 5, 2015.

113.    Upon information and belief, co-inventors Covelli and Simons initially owned the

Patents and patent applications by act of law upon filing of the associated patent applications, in

the absence of any written assignment assigning ownership thereof to a third party.

114.    Upon information and belief, co-inventors Covelli and Simons executed on April

06, 2016, and recorded with the United States Patent and Trademark Office ("U.S.P.T.O.") on

June 11, 2018, a written assignment purporting to assign U.S. Patent 10227114 to "Sirius Signal

Co." of 1042 North El Camino Real, Suite B-200, Encinitas, CA 92024.  U.S. Patent 10227114 is based on U.S. Patent Application 16004987 filed on June 11, 2018.

115.    Upon information and belief, co-inventors Covelli and Simons, executed on April 06, 2016, and recorded with the U.S.P.T.O. on April 11, 2016, a written assignment purporting to assign U.S. Patent 9682754 to "Sirius Signal Co." of 1254 Scott Street, San Diego, CA 92106. U.S. Patent 9682754 is based on U.S. Patent Application 15095727 filed on April 11, 2016.

116.    Upon information and belief, co-inventors Covelli and Simons, executed on February 25, 2016, and recorded with the U.S.P.T.O. on March 7, 2016, a written assignment purporting to assign U.S. Patent D784175 to "Sirius Signal Co." and identified in the U.S.P.T.O. Assignment Records as "Asirius Signal Co." of 1254 Scott Street, San Diego, CA 92106.  U.S. Patent D784175 is based on U.S. Patent Application 29557241 filed on March 7, 2016.

117.    Upon information and belief, co-inventors Covelli and Simons, executed on February 25, 2016, and recorded with the U.S.P.T.O. on March 2, 2017, a written assignment purporting to assign U.S. Patent D811920 to "Sirius Signal Co." of 1254 Scott Street, San Diego, CA 92106.  U.S. Patent D811920 is based on U.S. Patent Application 29595834 filed on March 2, 2017.

118.    Upon information and belief, co-inventors Covelli and Simons, executed on January 05, 2019, and recorded with the U.S.P.T.O. on January 24, 2019, a written assignment purporting to assign U.S. Patent D844477 to "Sirius Signal, LLC" of 1042 North El Camino Real, Suite B-200, Encinitas, CA 92024.  U.S. Patent D844477 is based on U.S. Patent Application 29638591 filed on February 28, 2018.

119.    Upon information and belief, co-inventors Covelli and Simons, executed on April 06, 2016, and recorded with the U.S.P.T.O. on June 15, 2017, a written assignment purporting to

assign U.S. Patent Application 15624033, published as U.S. Patent Publication 20170349248, to "Sirius Signal Co." of 1254 Scott Street, San Diego, CA 92106.  U.S. Patent Application 15624033 was filed on June 15, 2017.

120.     Upon information and belief, co-inventors Covelli and Simons, executed on April 06, 2016, and recorded with the U.S.P.T.O. on January 11, 2019, a written assignment purporting to assign U.S. Patent Application 16245947, published as U.S. Patent Publication 20190161149, to "Sirius Signal Co." and identified in the U.S.P.T.O. Assignment Records as "Sirius Signal, LLC" of 1042 North El Camino Real, Suite B-200, Encinitas, CA 92024.  U.S. Patent Application 16245947 was filed on January 11, 2019.

121.     Under California Code of Regulations (CCR) section 21001(d)(1)(B)&(G), the unitary business entity identifiers "Co." and "Company" apply only to corporations, and not to limited liability companies, in the absence of the words or abbreviations for "limited" and "liability."

122.     Upon information, belief, and a diligent search, "Sirius Signal Co." does not exist as a legal entity in California or elsewhere.

123.     Upon information, belief, and a diligent search, "Sirius Signal, Inc." does not exist as a legal entity in California or elsewhere.

124.     Upon information and belief, the patent assignments purporting to assign patents and patent applications to "Sirius Signal Co." are legal nullities and void, because "Sirius Signal Co." does not exist, either as a legal entity or as an assignee, and thus cannot own the purported assigned patents and patent applications.  Therefore, co-inventors Covelli and Simons retained their ownership of the assets purportedly assigned to "Sirius Signal Co." and remain the owners of those assets.

125.    Upon information and belief, Sirius Signal, L.L.C. does not own any of the assets purportedly assigned to "Sirius Signal Co." that remain owned by co-inventors Anthony W. Covelli and Robert B. Simons, Jr.

126.    Upon information and belief, co-inventors Anthony W. Covelli and Robert B. Simons, Jr., know that "Sirius Signal Co." does not exist.

127.    Upon information and belief, Sirius Signal, L.L.C., as a legal entity, knows that "Sirius Signal Co." does not exist, at least by virtue of Covelli, CEO of Sirius Signal, L.L.C., knowing that "Sirius Signal Co." does not exist.

128.    Upon information and belief, Covelli and Simons personally knew that Sirius did not own at least a portion of the Patents covered in the Agreement during the term of the Agreement and intentionally misrepresented to W&P that Sirius owned all of the Patents.

129.    Upon information and belief, Covelli personally and intentionally misrepresented to W&P that the product to be licensed and sold pursuant to the Agreement, the C-1001, was patented.

130.    Upon information and belief,  Covelli personally and intentionally misrepresented to W&P that it should falsely mark the products with the numbers of patents that did not cover the product.

131.    Upon information and belief, Covelli personally and intentionally misrepresented to W&P that patents obtained, owned, and/or claimed to be owned by Sirius were valid when, in fact, he knew that they were invalid due to fraud, inequitable conduct, and violation of the duty to disclose material art to the USPTO.

132.    Upon information and belief, co-inventors Covelli and Simons were both aware of the duty to provide all relevant material art to the USPTO, and both inventors signed a

27

declaration that they would do so, and in violation of that declaration, both inventors intentionally failed to disclose at least U.S. Patent No. 6,168,288 to the U.S.P.T.O.

133.    In executing the Agreement, W&P detrimentally relied on Mr. Covelli's personal misrepresentation of these material facts relating to the ownership, scope, and validity of the Patents.  In performing under the Agreement, W&P's detrimental reliance on Mr. Covelli's personal material misrepresentations caused W&P to incur monetary damage by paying a substantial upfront fee and ongoing royalties to license from Sirius the Patents that are invalid, do not cover the distributed product, and a portion of which are not owned by Sirius.

134.    Upon information and belief, Sirius knew that Sirius did not own at least a portion of the Patents covered in the Agreement during the term of the Agreement and intentionally misrepresented to W&P that Sirius owned all of the Patents.

135.    Upon information and belief, Sirius knew and intentionally misrepresented to W&P that the product to be licensed and sold pursuant to the Agreement, the C-1001, was patented.

136.    Upon information and belief,  Sirius knew and intentionally misrepresented to W&P that it should falsely mark the products with the numbers of patents that did not cover the product.

137.    Upon information and belief, Sirius knew and intentionally misrepresented to W&P that patents obtained, owned, and/or claimed to be owned by Sirius were valid when, in fact, it knew that they were invalid due to fraud, inequitable conduct, and violation of the duty to disclose material art to the USPTO.

138.    Upon information and belief, co-inventors Sirius was aware of the duty to provide all relevant material art to the USPTO, and was aware that both inventors intentionally failed to

disclose at least U.S. Patent No. 6,168,288 to the U.S.P.T.O.

139.     In executing the Agreement, W&P detrimentally relied on Sirius's misrepresentation of these material facts relating to the ownership, scope, and validity of the Patents.  In performing under the Agreement, W&P's detrimental reliance on Sirius's material misrepresentations caused W&P to incur monetary damage by paying a substantial upfront fee and ongoing royalties to license from Sirius the Patents that are invalid, do not cover the distributed product, and at least a portion of which are not owned by Sirius.

140.     Upon information and belief, Sirius committed the tort of civil conspiracy with Covelli, Simons, and potentially others by: (1) combining or agreeing with a common purpose to commit an unlawful act or do an otherwise lawful act by unlawful means, through the purported licensing to W&P of the Patents not actually owned by Sirius, the purported licensing of patents that do not cover the product to be distributed in accordance with the Agreement, and the licensing of invalid patents procured by fraud; (2) committing the overt act in furtherance of the common purpose, through the misrepresentation to W&P of the ownership, validity, and scope of the Patents, the purported licensing to W&P of the Patents in the Agreement, and the withholding of material art from the U.S.P.T.O. to achieve the purpose of issuance of the fraudulent patents; and (3) causing W&P to incur actual damages, including monetary damages of the substantial upfront fee and ongoing royalties to license from Sirius the Patents that were obtained fraudulently, do not cover the scope of the distributed product, and at least a portion of which are not actually owned by Sirius.

## Count V – Fraud by Sirius

141.     W&P repeats and re-alleges each of the foregoing allegations as though fully set forth herein.

142.     Upon information and belief, Sirius knew that Sirius did not own at least a portion of the Patents covered in the Agreement during the term of the Agreement and intentionally misrepresented to W&P that Sirius owned all of the Patents.

143.     Upon information and belief, Sirius knew and intentionally misrepresented to W&P that the product to be licensed and sold pursuant to the Agreement, the C-1001, was patented.

144.     Upon information and belief,  Sirius knew and intentionally misrepresented to W&P that it should falsely mark the products with the numbers of patents that did not cover the product.

145.     Upon information and belief, Sirius knew and intentionally misrepresented to W&P that patents obtained, owned, and/or claimed to be owned by Sirius were valid when, in fact, he knew that they were invalid due to fraud, inequitable conduct, and violation of the duty to disclose material art to the USPTO.

146.     Upon information and belief, co-inventors Covelli and Simons were both aware of the duty to provide all relevant material art to the USPTO, and both inventors signed a declaration that they would do so, and in violation of that declaration, both inventors intentionally failed to disclose at least U.S. Patent No. 6,168,288 to the U.S.P.T.O.

147.     In executing the Agreement, W&P reasonably and detrimentally relied on Sirius's intentional misrepresentation of these material facts relating to the scope, validity, and ownership of the Patents.  In performing under the Agreement, W&P's detrimental reliance on Sirius's material misrepresentations caused W&P to incur monetary damage by paying a substantial upfront fee and ongoing royalties to license from Sirius the Patents that are invalid, do not cover

30

the product distributed under the Agreement, and a portion of which are not actually owned by Sirius.

148.     Upon information and belief, Sirius committed the tort of fraud, fraudulent inducement, and/or fraudulent misrepresentation, by: (1) intentionally misrepresenting to W&P the validity, scope, and ownership of the Patents in the Agreement; (2) knowing that misrepresentation was untrue; (3) intending to cause W&P to believe the misrepresentation; (4) leading to W&P to reasonably rely on the misrepresentation in W&P executing the Agreement and purportedly licensing the invalid Patents, some of which were not actually owned by Sirius; and (5) causing W&P to incur actual damages, including monetary damages of the substantial upfront fee and ongoing royalties to license from Sirius the Patents that are invalid, do not cover the product distributed under the Agreement, and a portion of which are not owned by Sirius.

149.     Upon information and belief, Sirius led W&P to believe that the product being sold by Sirius during the negotiations of the Agreement (i.e., model C-1001), was a product covered under the Patents and that the Patents were owned by Sirius.  In particular, Sirius led W&P to believe that Sirius's product was covered by U.S. Patent D720247 and U.S. Patent 6168288, when in fact that was not true.  The design patent D720247 bears little resemblance to Sirius's product, the model C-1001 later sold by W&P.  Indeed, Sirius tacitly acknowledged this lack of resemblance by later filing a new design patent application that issued as U.S. Patent D784175, which does resemble Sirius's product C-1001.  Similarly, at the time that Sirius made the misrepresentation to W&P regarding U.S. Patent 6168288, U.S. Patent 6168288 did not cover anything because it had expired on January 28, 2013, for failure to pay maintenance fees, so U.S. Patent 6168288 should not have been mentioned on the product packaging.  Moreover,

neither Sirius nor Covelli owned U.S. Patent 6168288 at the time and it wasn't included in the Agreement.

150.     Upon information and belief, Sirius committed the tort of fraud, fraudulent inducement, and/or fraudulent misrepresentation, by: (1) intentionally misrepresenting to W&P the validity and patent coverage of Sirius's products to be sold by W&P under the Agreement, and the ownership and inclusion of such in the Patents identified in the Agreement; (2) knowing that misrepresentation was untrue; (3) intending to cause W&P to believe the misrepresentation; (4) leading to W&P to reasonably rely on the misrepresentation in W&P executing the Agreement and purportedly licensing the Patents not actually owned by Sirius; and (5) causing W&P to incur actual damages, including monetary damages of the substantial upfront fee and ongoing royalties to license from Sirius the Patents that actually are not owned by Sirius.

## Count VI – Promissory Estoppel by Sirius

151.     W&P repeats and re-alleges each of the foregoing allegations as though fully set forth herein.

152.     Sirius is liable to W&P for equitable remedies under the doctrine of promissory estoppel, because: (1) during negotiations of Agreement with W&P, (2) Sirius represented and promised that Sirius would be able to grant, and would grant, to W&P an exclusive license to the Patents under the Agreement; (3) W&P relied on Sirius's representations and promises in executing the Agreement and performing under the Agreement; (4) W&P's reliance was to W&P's detriment, including payments of the substantial upfront fee and ongoing royalties; (5) Sirius failed to uphold the representations and promises by failing to own valid Patents having the necessary scope to cover the product distributed in accordance with the Agreement during the term of the Agreement, not being able to grant, and therefore not granting, W&P the promised

32

exclusive license to the Patents; and (6) it would be unfair, inequitable, and/or unconscionable for Sirius to retain the benefits of the Agreement in view of Sirius's failures to uphold the representations and promises.

153.     Equitable remedies that the Court may award W&P include, but are not limited to, voiding the Agreement, modifying the Agreement, disgorging from Sirius and returning to W&P the substantial upfront fee paid for the exclusive license to the Patents, and disgorging from Sirius and returning to W&P the royalties paid by W&P for sales of the Licensed Products covered under the exclusive license to the Patents.

### Count VII – Unjust Enrichment by Sirius

154.     W&P repeats and re-alleges each of the foregoing allegations as though fully set forth herein.

155.     Sirius is liable to W&P for equitable remedies under the doctrine of unjust enrichment, because: (1) Sirius executed the Agreement with W&P, in which Sirius represented to own valid Patents having a scope that covered the product to be distributed in accordance with the Agreement and purported to grant to W&P an exclusive license to the Patents, in exchange for a substantial upfront fee and ongoing royalties on sale of the Licensed Products; (2) Sirius was unjustly enriched by the receipt from W&P of the substantial upfront fee and ongoing royalties on sale of the Licensed Products, because upon execution of the Agreement and since, Sirius did not own valid Patents having a scope that covered the product to be distributed in accordance with the Agreement and was not able to grant to W&P the exclusive license required under the Agreement in exchange for the substantial upfront fee and ongoing royalties on sale of the Licensed Products paid by W&P; and (3) it would be unfair, inequitable, and/or unconscionable for Sirius to benefit from the Agreement at the expense of, and detriment to

33

W&P, which did not receive the bargained-for benefit of the exclusive license under the Agreement.

156.     Equitable remedies that the Court may award W&P include, but are not limited to, voiding the Agreement, modifying the Agreement, disgorging from Sirius and returning to W&P the substantial upfront fee paid for the exclusive license to the Patents, and disgorging from Sirius and returning to W&P the royalties paid by W&P for sales of the Licensed Products covered under the exclusive license to the Patents.

### Count VIII - Declaratory Judgment of Unenforceability of the Patents Due to Inequitable Conduct by Sirius

157.     W&P repeats and re-alleges each of the foregoing allegations as though fully set forth herein.

158.     Every patent applicant, inventor, and person or entity associated with the filing or prosecution of a U.S. patent application before the U.S.P.T.O. ("application participants") has a statutory duty of disclosure and duty of candor and good faith in prosecuting said patent application.  Federal Regulation 37 CFR §1.56 states, "Each individual associated with the filing and prosecution of a patent application has a duty of candor and good faith in dealing with the Office, which includes a duty to disclose to the Office all information known to that individual to be material to patentability as defined in this section. The duty to disclose information exists with respect to each pending claim until the claim is cancelled or withdrawn from consideration, or the application becomes abandoned."

159.     Accordingly, said application participants are required to disclose to the U.S.P.T.O. any material, non-cumulative prior art reference that is known to the application participant and is relevant to the patentability of a claim of a pending patent application in which the application participant is participating.

160.     Failure to disclose a known, material, non-cumulative prior art reference that "compels a conclusion that a claim is unpatentable" (37 CFR §1.56(b)) may be interpreted as a knowing and intentional failure to disclose with the intent to deceive the U.S.P.T.O. where the evidence shows that individual associated with the application suspected that the reference might render a claim unpatentable, but chose to not disclose the reference nonetheless.

161.     As the Court of Appeals for the Federal Circuit stated in *Therasense, Inc. v. Becton, Dickinson and Company*, 649 F.3d 1276 (Fed. Cir. 2011) (*en banc*), "Inequitable conduct is an equitable defense to patent infringement that, if proved, bars enforcement of a patent," making the entire patent unenforceable against anyone. "Direct evidence of intent [to deceive] is not, however, required," the Federal Circuit's decision reads. "A court may infer intent from circumstantial evidence."

162.     Upon information and belief, Covelli, the CEO of Sirius and the co-inventor of the Patents under the Agreement, knew, and therefore Sirius knew, at least as early as December 18, 2015, of U.S. Patent 6,168,288 assigned to Tektite Industries, Inc.

163.     Upon information and belief, Covelli knew, and therefore Sirius knew, at least as early as December 18, 2015, that U.S. Patent 6,168,288 was material to the patentability of the model C-1001 Licensed Product.

164.     Upon information and belief, Covelli believed, and therefore Sirius believed, at least as early as December 18, 2015, that U.S. Patent 6,168,288 was relevant to the model C-1001 Licensed Product.

165.     Upon information and belief, Covelli informed, and therefore Sirius informed, W&P's former President, Peter Trogdon, in writing on December 18, 2015, prior to execution of the Agreement, that U.S. Patent 6,168,288 was relevant to, or covered, the model C-1001.

166.     Upon information and belief, neither Covelli nor Sirius informed Trogdon or W&P prior to execution of the Agreement that neither Covelli nor Sirius owned U.S. Patent 6,168,288.

167.     Upon information and belief, neither Covelli nor Sirius informed Trogdon or W&P after execution of the Agreement that neither Covelli nor Sirius owned U.S. Patent 6,168,288.

168.     Upon information and belief, neither Covelli nor Sirius ever informed Trogdon or W&P that U.S. Patent 6,168,288 had expired January 02, 2013, for non-payment of maintenance fees.

169.     Upon information and belief, Covelli and Sirius included, at least as early as December 18, 2015, U.S. Patent 6,168,288 on the product labeling for the model C-1001 to mark the product as patented, even though neither Covelli nor Sirius owned U.S. Patent 6,168,288 and it had expired January 02, 2013, for non-payment of maintenance fees.

170.     Upon information and belief, neither Covelli nor Sirius disclosed U.S. Patent 6,168,288 to the U.S.P.T.O. during the prosecution of any of patent applications on which Covelli is listed as an inventor and were directed to the Licensed Products, including model C-1001.

171.     Upon information and belief, Covelli and Sirius, with the intent to deceive, intentionally withheld and intentionally failed to disclose U.S. Patent 6,168,288 to the U.S.P.T.O. during the prosecution of any of patent applications on which Covelli is listed as an inventor and were directed to the Licensed Products, including model C-1001.

172.     Upon information and belief, Sirius and Covelli committed inequitable conduct and/or fraud on the U.S.P.T.O. in and during prosecution of at least one of the patent applications

associated with the Patents, by: (1) knowing of at least one material, non-cumulative prior art reference, (2) failing to disclose the reference to the U.S.P.T.O. during prosecution of said patent application, and (3) breaching the duty of disclosure and the duty of candor and good faith during prosecution of said patent application by said failure to disclose involving a material misstatement or omission with intent to deceive. As a consequence of Sirius's aforementioned inequitable conduct and/or fraud on the U.S.P.T.O., said patent application and any resulting patent issued therefrom are unenforceable.

173.     Unenforceability of a patent due to inequitable conduct is a complete affirmative defense to any allegation of infringement of a patent held to be unenforceable. *See Therasense, Inc. v. Becton, Dickinson and Company*, 649 F.3d 1276 (Fed. Cir. 2011) (*en banc*).

174.     W&P requests a declaration that said patent application and any resulting patent issued therefrom, in which Covelli and Sirius intentionally failed to disclose U.S. Patent 6,168,288, are unenforceable, and that W&P therefore cannot infringe any of the patents or patent applications held to be unenforceable, because such patents or patent applications are unenforceable.

## <u>Count IX – Declaratory Judgment of Invalidity of the Patents held by Sirius</u>

175.     W&P repeats and re-alleges each of the foregoing allegations as though fully set forth herein.

176.     Upon information and belief, Covelli knew, and therefore Sirius knew, at least as early as December 18, 2015, that U.S. Patent 6,168,288 was material to the patentability of the model C-1001 Licensed Product.

177.     Upon information and belief, neither Covelli nor Sirius disclosed U.S. Patent 6,168,288 to the U.S.P.T.O. during the prosecution of any of patent applications on which

Covelli is listed as an inventor and were directed to the Licensed Products, including model C-1001.

178.     W&P requests a declaration that said patent application and any resulting patent issued therefrom, in which Covelli and Sirius failed to disclose U.S. Patent 6,168,288, and in which U.S. Patent 6,168,288 is material to the patentability of the issued claims, are invalid as either anticipated by U.S. Patent 6,168,288, or obvious in view of U.S. Patent 6,168,288 and other related prior art.

179.     Invalidity of a patent due to unpatentability is a complete affirmative defense to any allegation of infringement of a patent held to be invalid.

180.     W&P requests a declaration that W&P therefore cannot infringe any of Sirius's patents or patent applications held to be invalid, because such patents or patent applications are invalid.

## Count X – False Patent Marking by Sirius

181.     W&P repeats and re-alleges each of the foregoing allegations as though fully set forth herein.

### a.   U.S. Patent D720247

182.     False patent marking statute 35 U.S.C. §292(a) criminalizes false marking of products with patent information, including, "Whoever marks upon, or affixes to, or uses in advertising in connection with any unpatented article, the word "patent" or any word or number importing that the same is patented, for the purpose of deceiving the public; … Shall be fined not more than $500 for every such offense."  Subsection (b) provides, "A person who has suffered a competitive injury as a result of a violation of this section may file a civil action in a district court of the United States for recovery of damages adequate to compensate for the injury."

183.    Upon information and belief, Covelli and Sirius included, at least as early as December 18, 2015, U.S. Patent D720247 on the product labeling for the model C-1001 to mark the product as patented, even though U.S. Patent D720247 clearly did not cover or patent the model C-1001 product.

184.    Upon information and belief, Covelli informed, and therefore Sirius informed, W&P and W&P's former President, Peter Trogdon, in writing on December 18, 2015, prior to execution of the Agreement, that U.S. Patent D720247 covered the model C-1001 and was included in the product labeling of model C-1001.

185.    Upon information and belief, Covelli and Sirius deceived the public in general, and W&P in particular, that model C-1001 was a patented product covered by U.S. D720247, in violation of 35 U.S.C. §292(a).

186.    Upon information and belief, W&P was fraudulently induced into executing the Agreement based on the willfully false misrepresentations of Covelli and Sirius that model C-1001 and the Licensed Products were patented and covered by at least U.S. Patent D720247.

187.    Upon information and belief, W&P suffered a competitive injury under 35 U.S.C. §292(b) as a result of Covelli's and Sirius's violation of 35 U.S.C. §292(a), inasmuch as Covelli's and Sirius's violation of 35 U.S.C. §292(a) fraudulently induced W&P to execute the Agreement to obtain an exclusive license to the Patents, for which W&P paid a substantial upfront fee and ongoing royalties based in part on the detrimental reliance on Covelli's and Sirius's misrepresentation that model C-1001 was patented and covered by at least U.S. Patent D720247.

### b. U.S. Patent 9171436

188.     Upon information and belief, Covelli and Sirius included, possibly as early as October 27, 2015, U.S. Patent 9171436 on the product packaging or labeling for the model C-1001 to mark the product as patented, even though U.S. Patent 9171436 clearly did not cover or patent the model C-1001 product.

189.     Upon information and belief, possibly as early as October 27, 2015, Covelli informed, and therefore Sirius informed, W&P and W&P's former President, Peter Trogdon that U.S. Patent 9171436 covered the model C-1001 and was included in the product packaging or labeling of model C-1001.

190.     Upon information and belief, Covelli and Sirius deceived the public in general, and W&P in particular, that model C-1001 was a patented product covered by U.S. 9171436, in violation of 35 U.S.C. §292(a).

191.     Upon information and belief, W&P was fraudulently induced into executing or performing the Agreement based on the willfully false misrepresentations of Covelli and Sirius that model C-1001 and the Licensed Products were patented and covered by U.S. Patent 9171436.

192.     Upon information and belief, W&P suffered a competitive injury under 35 U.S.C. §292(b) as a result of Covelli's and Sirius's violation of 35 U.S.C. §292(a), inasmuch as Covelli's and Sirius's violation of 35 U.S.C. §292(a) fraudulently induced W&P to execute or perform the Agreement to obtain an exclusive license to the Patents, for which W&P paid a substantial upfront fee and ongoing royalties based in part on the detrimental reliance on Covelli's and Sirius's misrepresentation that model C-1001 was patented and covered by at least U.S. Patent 9171436.

## Count XI – Indirect Unjust Enrichment by Sirius

193.    W&P repeats and re-alleges each of the foregoing allegations as though fully set forth herein.

194.    Sirius ordered floats from one of W&P's suppliers, Pan-U Industries Co. Ltd, for use in Sirius's manufacturing of the Licensed Products, and Sirius inappropriately billed the cost of the floats to W&P without W&P's advance knowledge, permission, or authorization.

195.    Sirius benefited from Sirius's actions by not having to pay for the floats, and from W&P's actions by W&P being billed for Sirius's order, to the detriment and damage of W&P.

196.    Sirius knew that Sirius benefited from Sirius's actions in billing the order to W&P, and from W&P's actions in W&P being billed for Sirius's order, to the detriment and damage of W&P.

197.    Sirius accepted and retained this benefit, and it is inequitable for Sirius to retain the benefit without payment of its value as the compensation that is deserved.

198.    Sirius ordered product from one of W&P's suppliers, EmLinQ, LLC, for use in Sirius's manufacturing of the Licensed Products, and the cost of shipping the product to Sirius was inappropriately billed to W&P without W&P's advance knowledge, permission, or authorization.

199.    Sirius benefited from Sirius's actions by not having to pay for the shipping, and from W&P's actions by W&P being billed for the shipping, to the detriment and damage of W&P.

200.    Sirius knew that Sirius benefited from Sirius's actions in billing the shipping to W&P, and from W&P's actions in W&P being billed for Sirius's shipping costs, to the detriment and damage of W&P.

201.   Sirius accepted and retained this benefit, and it is inequitable for Sirius to retain the benefit without payment of its value as the compensation that is deserved.

202.   W&P was damaged at least by being billed for the costs of the floats and shipping.  W&P deserves compensation for being billed the costs of the floats and shipping provided to Sirius and for recovery of the costs incurred, including attorneys' fees and court costs, in obtaining said compensation.

## PRAYER FOR RELIEF AGAINST SIRIUS

WHEREFORE, W&P prays for the following:

### Primary Set of Prayers for Relief:

A.   An order declaring each patent Assignment to "Sirius Signal Co." null and void;

B.   An order declaring the Agreement null and void;

C.   An order requiring Sirius to repay to W&P the substantial upfront fee and all royalties paid by W&P to date, including those held in the court's registry;

D.   An order declaring that the patents are unenforceable due to the inequitable conduct of Covelli and Sirius;

E.   An order declaring that the patents are invalid due to the unpatentability of claims for which U.S. Patent 6,168,288 is material to patentability, in view of U.S. Patent 6,168,288 not disclosed by Covelli or Sirius during patent prosecution;

F.   An order declaring that W&P suffered a competitive injury due to Covelli's and Sirius's false patent marking, and compensating W&P accordingly;

G.   An order requiring Sirius to indemnify W&P for any liability for infringement of any future patents issued to Sirius or Covelli;

H.   An order requiring Sirius to pay compensation for its unjust enrichment;

I.      An order requiring Sirius to cease its unfair competition and tortious interference with the business relations and contracts of W&P and to pay compensation to W&P for its lost sales and other damages caused by same;

J.      An order requiring Sirius to pay compensation for the damage to the reputation of W&P;

K.      An award to W&P of compensatory and punitive damages;

L.      An award to W&P of interests, costs, and attorneys' fees; and

M.      Such further relief as this Court may deem just and equitable.

**Secondary Set of Prayers for Relief:**

In the event that the Court decides not to follow the Primary Set of Prayers for Relief by virtue of deciding that the Agreement will not be held null and void, W&P prays that the Court follow this Secondary Set of Prayers for Relief that includes the following:

A.      An order declaring each patent Assignment to "Sirius Signal Co." null and void;

B.      An order that Sirius breached the Agreement;

C.      An order that Sirius was unjustly enriched by the Agreement;

D.      An order requiring Sirius to repay to W&P the substantial upfront fee and all royalties paid by W&P to date, including those held in the court's registry;

E.      An order declaring that the patents are unenforceable due to the inequitable conduct of Covelli and Sirius;

F.      An order declaring that the patents are invalid due to the unpatentability of claims for which U.S. Patent 6,168,288 is material to patentability, in view of U.S. Patent 6,168,288 not disclosed by Covelli or Sirius during patent prosecution;

G.    An order declaring that W&P suffered a competitive injury due to Covelli's and

        Sirius's false patent marking, and compensating W&P accordingly;

H.    An order indemnifying W&P for any liability for infringement of any future

        patents issued to Sirius or Covelli;

I.     An order requiring Sirius to cease its unfair competition and tortious interference

        with the business relations and contracts of W&P and to pay compensation to

        Sirius for its lost sales and other damages caused by same;

J.     An order requiring Sirius to pay compensation for its unjust enrichment;

K.     An order requiring Sirius to pay compensation for the damage to the reputation of

        W&P;

L.     An award to W&P of compensatory and punitive damages;

M.     An award to W&P of interests, costs, and attorneys' fees; and

N.     Such further relief as this Court may deem just and equitable.

**Tertiary Set of Prayers for Relief:**

In the event that the Court decides not to follow the Primary Set of Prayers for Relief by virtue of deciding that the Agreement will not be held null and void and the Secondary Set of Prayers for Relief by virtue of deciding that Sirius was not unjustly enriched, W&P prays that the Court follow this Tertiary Set of Prayers for Relief that includes the following:

A.    An order declaring each patent Assignment to "Sirius Signal Co." null and void;

B.    An order that Sirius breached the Agreement;

C.    An order declaring that the patents are unenforceable due to the inequitable

        conduct of Covelli and Sirius;

D.     An order declaring that the patents are invalid due to the unpatentability of claims

for which U.S. Patent 6,168,288 is material to patentability, in view of U.S. Patent

6,168,288 not disclosed by Covelli or Sirius during patent prosecution;

E.     An order declaring that W&P suffered a competitive injury due to Covelli's and

Sirius's false patent marking, and compensating W&P accordingly;

F.     An order indemnifying W&P for any liability for infringement of any future

patents issued to Sirius or Covelli;

G.     An order requiring Sirius to cease its unfair competition and tortious interference

with the business relations and contracts of W&P and to pay compensation to

Sirius for its lost sales and other damages caused by same;

H.     An order requiring Sirius to pay compensation for its breach of the Agreement;

I.     An order requiring Sirius to pay compensation for the damage to the reputation of

W&P;

J.     An award to W&P of compensatory and punitive damages;

K.     An award to W&P of interests, costs, and attorneys' fees; and

L.     Such further relief as this Court may deem just and equitable.

## REQUEST FOR JURY TRIAL

W&P hereby requests a jury trial on all issues so triable.

## FIRST AMENDED THIRD-PARTY COMPLAINT

Defendant/Third Party Plaintiff Weems & Plath, LLC ("W&P" or "Third-Party Plaintiff") by and through its undersigned counsel, hereby asserts the following First Amended Third-Party Complaint against Third-Party Defendant Anthony W. Covelli ("Covelli"), and states for cause as follows:

## Parties

1.      Third-Party Plaintiff W&P is a Maryland limited liability company with its principal place of business at 214 Eastern Avenue, Annapolis, Maryland 21403.  The sole member of Weems & Plath, LLC is a citizen of New Jersey.  W&P's predecessor-in-interest, Weems & Plath, Inc., was a Maryland corporation.

2.      Upon information and belief, Third-Party Defendant Covelli resides in the State of California at 6541 Vispera Place, Carlsbad, California 92009.

3.      Covelli is an owner of, a member of, and the CEO of Plaintiff Sirius Signal, L.L.C. ("Sirius").  As a member and owner of Sirius Signal, L.L.C., Covelli is not an employee of Sirius under relevant federal and state laws pertaining to employment and taxation.  Rather, Covelli's authority to bind, act on behalf of, and in concert with, Sirius arises out of Covelli's ownership and member status relative to Sirius.  Likewise, as an individual, Covelli is distinct from the legal entity Sirius Signal, L.L.C., and Covelli has used Sirius to act as Covelli's agent in conduct described herein.

## Jurisdiction

4.      This Court has subject matter jurisdiction over W&P's claims pursuant to 28 U.S.C. § 1332 because the parties are diverse and the amount in controversy exceeds $75,000. W&P is a citizen of Maryland as it is a Maryland limited liability company, and W&P's member

is a citizen of New Jersey.  Sirius is a citizen of California as it is a California limited liability

company, and Sirius's members are citizens of California.

5.      This Court has personal jurisdiction over Covelli pursuant to federal principles of

due process and to Maryland Code, Courts and Judicial Proceedings section 6-103(b)(4)

(Maryland's "Long Arm Statute" at MD Cts. & Jud. Pro. Code § 6-103 (2018)), because (1)

Covelli has purposefully availed himself of this Court by filing on behalf of, and in concert with,

Sirius an action related to the Agreement, governed by Maryland law, with a Maryland company

covering Patents personally owned by Covelli; (2) Covelli has purposefully availed himself of

this Court by consenting to the personal jurisdiction of this Court to determine the status of the

Agreement with the Maryland company covering Patents personally owned by Covelli,

consenting to be governed by Maryland law in interpretation and enforcement of the Agreement,

and consenting to personally bind himself in the Third Amendment of the Agreement; (3)

Covelli has purposefully availed himself of this District by transacting business in this District

through personally negotiating with the Maryland company the Agreement to license Patents

personally owned by Covelli, personally negotiating with the Maryland company several

Amendments to the Agreement, and transacting business with the Maryland company relating to

the licensing of Patents personally owned by Covelli; and (4) Covelli has triggered specific

personal jurisdiction by causing to the Maryland company the tortious injuries that comprise the

basis of W&P's third-party claims through the actions described below.

## Venue

6.      Venue is proper in this district as Covelli's acts, omissions and events giving rise

to W&P's causes of action occurred within or were directed to this district and have caused

damage within this district.

7.      Venue is also proper in this district pursuant to 28 U.S.C. § 1367 because Plaintiff/Counter-Defendant Sirius brought its Declaratory Judgment claim before this Court, and the Third-Party Claims form part of the same case or controversy as Plaintiff/Counter-Defendant's Declaratory Judgment claim.  In particular, the nature of a Declaratory Judgment ("DJ") claim reverses the typical positions of the parties, whereby a DJ-Plaintiff seeking a Declaratory Judgment typically would be the non-DJ-Defendant in a non-DJ action if the DJ-Plaintiff had waited for the DJ-Defendant to file the non-DJ action against the DJ-Plaintiff as the non-DJ-Defendant.  Likewise, the DJ-Defendant typically would be the non-DJ-Plaintiff in a non-DJ action against the DJ-Plaintiff, and therefore the DJ-Defendant should be afforded the broad latitude in filing claims normally afforded non-DJ-Plaintiffs.

### Facts

8.      W&P repeats and re-alleges each of the foregoing allegations from the previously filed Answer and Affirmative Defenses, and the First Amended Counter-Complaint as though fully set forth herein.

9.      On December 31, 2015, W&P and Sirius entered into a contract (the "Agreement," attached hereto as Exhibit A) for distribution of certain electronic marine distress signaling devices, which W&P believed were patented devices, whereby W&P would have an exclusive license to manufacture, distribute, advertise, publicize, market and sell the Licensed Products (as defined below) (the "License") in exchange for W&P making a substantial upfront payment to Sirius and paying ongoing royalties to Sirius on sales of the Licensed Products.

10.      During negotiation of the Agreement, Covelli knowingly misrepresented that the product to be licensed and sold pursuant to the Agreement, the C-1001, was patented, in order to induce W&P to execute and perform the Agreement, including W&P making payment of a

substantial upfront fee and ongoing royalties for related sales of the Licensed Products.  Covelli
also knowingly directed W&P to falsely mark the products with the numbers of patents that did
not cover the product.

      11.    Section 12b. *Governing Law* of the Agreement states, "This Agreement and the
rights and obligations of the parties under it are governed by and interpreted in accordance with
the laws of the State of Maryland (without regard to principles of conflicts of law)."

      12.    The Parties executed three amendments to the Agreement (i.e., the First
Amendment executed February 8, 2016; the [Second] Amendment made March 10, 2016; and
the Third Amendment made August 18, 2017).

      13.    The Third Amendment states in Section 8 <u>Binding Agreement</u>, "The Agreement
as modified herein shall be binding on and inure to the benefit of the … legal representatives, …
owners, … members, … and any other person or entity claiming under or through the parties."
Covelli is a legal representative, owner, and member of Sirius Signal, L.L.C., and personally
signed the Third Amendment, thereby personally binding himself and making the Agreement
binding on him.

      14.    The Third Amendment states in Section 9 <u>Authority to Execute</u>, "The parties to
the Third Amendment and the Agreement as modified warrant, covenant and agree that the
persons executing this Agreement are authorized and empowered to enter into and execute this
Agreement as modified for and on behalf of the person or entity they represent, and that by their
execution of the Agreement, each respective person or entity they represent, and all persons,
partnerships, corporations, joint ventures and any person or entities affiliated with them, shall be
bound by the terms of this Agreement."  Covelli signed the Third Amendment and was
authorized and empowered to personally bind himself and make the Agreement binding on him.

15.    "Know-How" is defined in the Agreement, as amended, to "have its usual and accepted meaning such as, by way of example, but not of limitation, all factual knowledge, proprietary information, trade secrets, procedures, processes, methods, designs, discoveries, inventions, patent application, licenses, software and source code, programs, prototypes, techniques, ideas, concepts, data, engineering, manufacturing information, techniques, ideas, concepts, data, engineering, manufacturing information, specifications, diagrams, schematics, or rights or works of authorship, that give to the one acquiring it an ability to study, test, produce, formulate, manufacture or market the SOS Distress Light SOS A-1001 sold by Sirius or variations thereof, which one otherwise would not have known how to study, test, produce, formulate, manufacture or market in the same way."

16.    "Licensed Products" are defined in the Agreement, as amended, to include, *inter alia*, "[a]ny product made, used, sold, imported or offered for sale that includes or is covered by any of the Patents or Know How."

17.    "Patents" are as defined in the Agreement, as amended, and include "(b) all current and future patents related to the SOS Distress Light SOS A-1001 sold by Sirius or variations thereof that may be granted thereon [and] (c) any future patents and/or patent applications owned by Sirius and covering one or more aspects of the SOS Distress Light SOS A-1001 sold by Sirius as of December 30, 2015 or variations thereof."

   **a. EMLinQ**

18.    EMLinQ is a circuit board manufacturer, from which W&P repeatedly has obtained circuits boards for use in the Licensed Products, and with which W&P has had an ongoing customer-supplier business relationship. On July 16, 2019, W&P sent a purchase order

to EMLinQ, for 5,000 circuit boards for use in W&P manufacturing the Licensed Products of the Agreement with Sirius.

19.     On July 29, 2019, EMLinQ informed W&P that EMLinQ had a call with Anthony Covelli regarding the purchase order.

20.     In furtherance of Sirius's activities to manufacture the License Products, and in breach of the Agreement, Covelli placed an order with EMLinQ for the same components that W&P had ordered from EMLinQ.

21.     On July 29, 2019, EMLinQ informed W&P that it was "unable" (or implicitly unwilling) to fulfill the W&P order, because of the influence exerted on EMLinQ by Anthony Covelli, the CEO of Sirius.

22.     Upon information and belief, Covelli is a close acquaintance of a representative of EMLinQ, and Mr. Covelli conspired with the EMLinQ representative and exerted inappropriate influence on EMLinQ to interfere with W&P's order for circuit boards for the Licensed Products.  Upon information and belief, Mr. Covelli and Sirius made to EMLinQ statements that were literally false and/or likely to mislead, confuse or deceive regarding W&P's rights to manufacture the Licensed Products, and Mr. Covelli's and Sirius's statements caused commercial injury to W&P by harming W&P's ability to manufacture, and therefore sell, the Licensed Products, including introducing inappropriate competition from Sirius in breach of W&P's Exclusive Rights under the Agreement.

23.     Because of Mr. Covelli's inappropriate influence on EMLinQ, EMLinQ temporarily stopped supplying the circuit boards to W&P.

24.     Without the additional circuit boards, W&P was limited in W&P's ability to manufacture and sell the Licensed Products, including during a time period that Covelli does not

dispute the Agreement is still in effect.  EMLinQ has not resumed supplying circuit boards to W&P as of November 29, 2019.

   **b.  <u>Customer A</u>**

   25.     W&P has been selling the Licensed Products to Customer A since around 2015. W&P has had business and contractual relations with Customer A since at least 2015, and W&P reasonably has an expectation of ongoing prospective business and contractual relations with Customer A.  Customer A is representative of W&P's customers similarly impacted by Sirius's and Covelli's activities, which have put W&P's customers in the middle of the dispute with Sirius and Covelli.

   26.     Prior to August 25, 2019, Covelli informed Customer A that Customer A would no longer be able to obtain the Licensed Products from W&P and that Customer A would need to buy from Sirius the Licensed Products manufactured by Sirius.

   27.     Covelli's assertion to Customer A is untrue.  Covelli's untrue comments to at least Customer A constitute fraud, deceit, trickery, bad faith, and/or unfair methods.  Upon information and belief, Covelli made to Customer A statements that were literally false and/or likely to mislead, confuse or deceive regarding W&P's rights to manufacture the Licensed Products, and Covelli's statements caused commercial injury to W&P by harming W&P's ability to manufacture, and therefore sell, the Licensed Products, including introducing inappropriate competition from Sirius in breach of W&P's Exclusive Rights under the Agreement.

   28.     Section 11 of the Agreement states that: "Upon the termination or expiration of this Agreement for whatever reason, W&P … shall be able to continue to sell, on a non-exclusive basis, existing Licensed Products [in] inventory…."

29.     Covelli's actions caused at least Customer A to stop buying the Licensed Products from W&P, causing W&P to lose existing and future sales to at least Customer A of the Licensed Product.  Customer A has indicated to W&P that while Covelli disputes that W&P has the right to manufacture and sell the Licensed Products, Customer A will not buy the Licensed Products from W&P or anyone.

### Count I – Breach of Contract by Covelli

30.     W&P repeats and re-alleges each of the foregoing allegations as though fully set forth herein.

31.     The Agreement between W&P and Sirius is a contract and forms the basis of a contractual relationship between W&P and Sirius.

32.     Pursuant to the Third Amendment that Covelli personally signed, Covelli personally bound himself by the Agreement and made the Agreement binding on him, by virtue of Covelli being any of a legal representative, an owner, and a member of Sirius Signal, L.L.C.

33.     As a member and owner of Sirius Signal, L.L.C., Covelli is not an employee of Sirius, Covelli is distinct from the legal entity Sirius Signal, L.L.C., and Covelli has used Sirius to act as Covelli's agent in conduct described herein.

34.     Being personally bound by the Agreement, Covelli has breached the Agreement with W&P, as an individual, and through the intentional and improper actions of Sirius as Covelli's agent and of Covelli on behalf of and/or in concert with Sirius, described above with respect to at least Orion, EMLinQ, and Customer A (*see, e.g.*, Count I of the Counter-Complaint).

35.     Covelli's actions as an individual, and through the intentional and improper actions of Sirius as Covelli's agent and of Covelli on behalf of and/or in concert with Sirius

described above, have violated W&P's rights under the Agreement and impaired W&P's ability to obtain the full benefits of the Agreement.

36.     Covelli's aforementioned actions in breach of the Agreement have damaged W&P's reputation and goodwill.

37.     Covelli's tortious actions in breach of the Agreement have damaged W&P financially in an amount exceeding $75,000.

## Count II – Unfair Competition by Covelli

38.     W&P repeats and re-alleges each of the foregoing allegations as though fully set forth herein.

39.     Through the actions set forth above with respect to at least EMLinQ and Customer A, Covelli has damaged, impaired, and/or jeopardized W&P's business through fraud, deceit, trickery, bad faith, and/or unfair methods.  Upon information and belief, Covelli committed unfair competition inasmuch as (1) Covelli made to EMLinQ and Customer A statements that were literally false and/or likely to mislead, confuse or deceive regarding W&P's rights to manufacture the Licensed Products, and (2) Covelli's statements caused commercial injury to W&P by harming W&P's ability to manufacture, and therefore sell, the Licensed Products, including introducing inappropriate competition from Sirius in breach of W&P's Exclusive Rights under the Agreement.

40.     Due to Covelli's untrue communications to Customer A and Customer A's reliance thereon, W&P's ability to sell the Licensed Products to Customer A has been impaired.

41.     Also due to Covelli's untrue communications to Customer A and Customer A's reliance thereon, W&P's ability to sell other products to Customer A has been jeopardized,

because the inappropriate uncertainty caused by Covelli's untrue communications has undermined Customer A's faith in W&P as a supplier.

42.      Also due to Covelli's untrue communications to Customer A and Customer A's reliance thereon, W&P's reputation and goodwill in the perspective of Customer A have been damaged by Covelli's actions, because Covelli's untrue communications have undermined Customer A's faith in W&P in general.

43.      Covelli's tortious actions have financially damaged W&P in an amount exceeding $75,000.

### Count III - Tortious Interference with Business Relations/Expectancy by Covelli

44.      W&P repeats and re-alleges each of the foregoing allegations as though fully set forth herein.

45.      Covelli's actions described above have impaired W&P's ability to reliably and predictably obtain the circuit boards from EMLinQ.

46.      When W&P is not able to obtain the circuit boards, W&P is unable to manufacture the Licensed Products.  Therefore, Covelli's actions have impaired W&P's ability to reliably and predictably manufacture the Licensed Products, thereby damaging W&P's ability to sell the Licensed Products and exercise W&P's Exclusive Rights under the Agreement.

47.      Covelli's actions described above with respect to EMLinQ were performed intentionally and were reasonably calculated to cause damage to W&P's business.  W&P has had ongoing business relations with EMLinQ, and but for Covelli's interference, W&P has had a reasonable probability of ongoing and future business opportunities with EMLinQ.

48.      Covelli's actions described above with respect to EMLinQ were done with the unlawful purpose to cause damage and loss to W&P, without right or justifiable cause.

49.     W&P has been damaged financially and reputationally from Covelli's actions described above with respect to EMLinQ.

50.     Due to Covelli's actions described above, W&P's ability to sell the Licensed Products to Customer A has been impaired.

51.     Due to Covelli's actions described above, W&P's ability to sell other products to Customer A has been jeopardized.

52.     Covelli's actions described above with respect to Customer A were performed intentionally and were reasonably calculated to cause damages to W&P's business.  W&P has had ongoing business relations with Customer A, and but for Covelli's interference, W&P has had a reasonable probability of ongoing and future business opportunities with Customer A.

53.     Covelli's actions described above with respect to Customer A were done with the unlawful purpose to cause damage and loss, without right or justifiable cause.

54.     W&P has been damaged financially and reputationally from Covelli's actions described above with respect to Customer A.

55.     Covelli's actions with respect to at least EMLinQ and Customer A were wrongful or unlawful because they frustrated W&P's ability to perform W&P's Exclusive Rights under, and obtain the benefit of, the Agreement, to which Covelli personally bound himself explicitly in the Third Amendment, and they breached an implied covenant of good faith and fair dealing.

56.     Covelli's actions with respect to Customer A were additionally wrongful or unlawful because they breached Section 2 of the Agreement by (1) Covelli violating W&P's exclusive license to advertise, publicize, market or sell the Licensed Products to Customer A, and by (2) Covelli attempting to advertise, publicize, market or sell to Customer A Licensed Products not purchased from W&P for resale.

57.     Covelli's actions intentionally have interfered tortiously with W&P's business and contractual relations with EMLinQ and Customer A.  Covelli's actions intentionally have interfered tortiously with W&P's prospective business advantage with Customer A.  Namely, Covelli's actions have proximately caused W&P's ability to manufacture and sell the Licensed Products to decrease, and have damaged W&P at least in terms of lost current and future sales, decreased product turnover, and associated decreased profits.  As a result of Covelli's tortious interference, W&P has been damaged financially and reputationally in W&P's existing and prospective business relationships with at least EMLinQ and Customer A.

58.     Covelli committed tortious interference with W&P's business relations inasmuch as (1) W&P had beneficial business relations with at least Customer A and EMLinQ, (2) Covelli knew of W&P's beneficial business relations, (3) Covelli intended to impair or cause a detriment to W&P's business relations, (4) Covelli lacked any privilege to impair or cause a detriment to W&P's business relations, (5) Covelli impaired or caused a detriment to W&P's business relations, and (6) Covelli's actions caused damage to W&P.

## Count IV – Civil Conspiracy by Covelli

59.     W&P repeats and re-alleges each of the foregoing allegations as though fully set forth herein.

60.     Upon information and belief, Sirius Signal, L.L.C. was formed by Anthony W. Covelli and Robert B. Simons, Jr. ("Simons"), in California on March 05, 2015, and identified as entity 201506810315.

61.     Upon information and belief, no legal entity possibly associated with Sirius is known to have existed prior the formation of Sirius Signal, L.L.C. on March 05, 2015.

62.      Upon information and belief, Sirius Signal, L.L.C. has as members, *inter alia,* Covelli and Simons, who are the co-inventors listed on Patents covered in the Agreement executed by Covelli on behalf of Sirius Signal, L.L.C.

63.      Upon information and belief, co-inventors Covelli and Simons claim to have created the initial devices and initial technology associated with the Patents and patent applications, the earliest of which was filed June 6, 2014, at least nine months before the formation of Sirius Signal, L.L.C. as a legal entity on March 5, 2015.

64.      Upon information and belief, co-inventors Covelli and Simons initially owned the Patents and patent applications by act of law upon filing of the associated patent applications, in the absence of any written assignment assigning ownership thereof to a third party.

65.      Upon information and belief, co-inventors Covelli and Simons executed on April 06, 2016, and recorded with the United States Patent and Trademark Office ("U.S.P.T.O.") on June 11, 2018, a written assignment purporting to assign U.S. Patent 10227114 to "Sirius Signal Co." of 1042 North El Camino Real, Suite B-200, Encinitas, CA 92024.  U.S. Patent 10227114 is based on U.S. Patent Application 16004987 filed on June 11, 2018.

66.      Upon information and belief, co-inventors Covelli and Simons, executed on April 06, 2016, and recorded with the U.S.P.T.O. on April 11, 2016, a written assignment purporting to assign U.S. Patent 9682754 to "Sirius Signal Co." of 1254 Scott Street, San Diego, CA 92106. U.S. Patent 9682754 is based on U.S. Patent Application 15095727 filed on April 11, 2016.

67.      Upon information and belief, co-inventors Covelli and Simons, executed on February 25, 2016, and recorded with the U.S.P.T.O. on March 07, 2016, a written assignment purporting to assign U.S. Patent D784175 to "Sirius Signal Co." and identified in the U.S.P.T.O.

Assignment Records as "Asirius Signal Co." of 1254 Scott Street, San Diego, CA 92106.  U.S. Patent D784175 is based on U.S. Patent Application 29557241 filed on March 07, 2016.

68.        Upon information and belief, co-inventors Covelli and Simons, executed on February 25, 2016, and recorded with the U.S.P.T.O. on March 02, 2017, a written assignment purporting to assign U.S. Patent D811920 to "Sirius Signal Co." of 1254 Scott Street, San Diego, CA 92106.  U.S. Patent D811920 is based on U.S. Patent Application 29595834 filed on March 02, 2017.

69.        Upon information and belief, co-inventors Covelli and Simons, executed on January 05, 2019, and recorded with the U.S.P.T.O. on January 24, 2019, a written assignment purporting to assign U.S. Patent D844477 to "Sirius Signal, LLC" of 1042 North El Camino Real, Suite B-200, Encinitas, CA 92024.  U.S. Patent D844477 is based on U.S. Patent Application 29638591 filed on February 28, 2018.

70.        Upon information and belief, co-inventors Covelli and Simons, executed on April 06, 2016, and recorded with the U.S.P.T.O. on June 15, 2017, a written assignment purporting to assign U.S. Patent Application 15624033, published as U.S. Patent Publication 20170349248, to "Sirius Signal Co." of 1254 Scott Street, San Diego, CA 92106.  U.S. Patent Application 15624033 was filed on June 15, 2017.

71.        Upon information and belief, co-inventors Covelli and Simons, executed on April 06, 2016, and recorded with the U.S.P.T.O. on January 11, 2019, a written assignment purporting to assign U.S. Patent Application 16245947, published as U.S. Patent Publication 20190161149, to "Sirius Signal Co." and identified in the U.S.P.T.O. Assignment Records as "Sirius Signal, LLC" of 1042 North El Camino Real, Suite B-200, Encinitas, CA 92024.  U.S. Patent Application 16245947 was filed on January 11, 2019.

72.        Under California Code of Regulations (CCR) section 21001(d)(1)(B)&(G), the unitary business entity identifiers "Co." and "Company" apply only to corporations, and not to limited liability companies, in the absence of the words or abbreviations for "limited" and "liability."

73.        Upon information, belief, and a diligent search, "Sirius Signal Co." does not exist as a legal entity in California or elsewhere.

74.        Upon information, belief, and a diligent search, "Sirius Signal, Inc." does not exist as a legal entity in California or elsewhere.

75.        Upon information and belief, the patent assignments purporting to assign patents and patent applications to "Sirius Signal Co." are legal nullities and void, because "Sirius Signal Co." does not exist, either as a legal entity or as an assignee, and thus cannot own the purported assigned patents and patent applications.  Therefore, co-inventors Covelli and Simons retained their ownership of the assets purportedly assigned to "Sirius Signal Co." and remain the owners of those assets.

76.        Upon information and belief, Sirius Signal, L.L.C. does not own any of the assets purportedly assigned to "Sirius Signal Co." that remain owned by co-inventors Anthony W. Covelli and Robert B. Simons, Jr.

77.        Upon information and belief, co-inventors Anthony W. Covelli and Robert B. Simons, Jr., know that "Sirius Signal Co." does not exist.

78.        Upon information and belief, Sirius Signal, L.L.C., as a legal entity, knows that "Sirius Signal Co." does not exist, at least by virtue of Covelli, CEO of Sirius Signal, L.L.C., knowing that "Sirius Signal Co." does not exist.

79.     Upon information and belief, Covelli and Simons personally knew that Sirius did not own at least a portion of the Patents covered in the Agreement during the term of the Agreement and intentionally misrepresented to W&P that Sirius owned all of the Patents.

80.     Upon information and belief, Covelli personally and intentionally misrepresented to W&P that the product to be licensed and sold pursuant to the Agreement, the C-1001, was patented.

81.     Upon information and belief,  Covelli personally and intentionally misrepresented to W&P that it should falsely mark the products with the numbers of patents that did not cover the product.

82.     Upon information and belief, Covelli personally and intentionally misrepresented to W&P that patents obtained, owned, and/or claimed to be owned by Sirius were valid when, in fact, he knew that they were invalid due to fraud, inequitable conduct, and violation of the duty to disclose material art to the USPTO.

83.     Upon information and belief, co-inventors Covelli and Simons were both aware of the duty to provide all relevant material art to the USPTO, and both inventors signed a declaration that they would do so, and in violation of that declaration, both inventors intentionally failed to disclose at least U.S. Patent No. 6,168,288 to the U.S.P.T.O.

84.     In executing the Agreement, W&P detrimentally relied on Mr. Covelli's personal misrepresentation of these material facts relating to the ownership, scope, and validity of the Patents.  In performing under the Agreement, W&P's detrimental reliance on Mr. Covelli's personal material misrepresentations caused W&P to incur monetary damage by paying a substantial upfront fee and ongoing royalties to license from Sirius the Patents that are invalid, do not cover the distributed product, and a portion of which are not owned by Sirius.

85.     Upon information and belief, Sirius knew that Sirius did not own at least a portion of the Patents covered in the Agreement during the term of the Agreement and intentionally misrepresented to W&P that Sirius owned all of the Patents.

86.     Upon information and belief, Sirius knew and intentionally misrepresented to W&P that the product to be licensed and sold pursuant to the Agreement, the C-1001, was patented.

87.     Upon information and belief,  Sirius knew and intentionally misrepresented to W&P that it should falsely mark the products with the numbers of patents that did not cover the product.

88.     Upon information and belief, Sirius knew and intentionally misrepresented to W&P that patents obtained, owned, and/or claimed to be owned by Sirius were valid when, in fact, it knew that they were invalid due to fraud, inequitable conduct, and violation of the duty to disclose material art to the USPTO.

89.     Upon information and belief, co-inventors Sirius was aware of the duty to provide all relevant material art to the USPTO, and was aware that both inventors intentionally failed to disclose at least U.S. Patent No. 6,168,288 to the U.S.P.T.O.

90.     In executing the Agreement, W&P detrimentally relied on Sirius's misrepresentation of these material facts relating to the ownership, scope, and validity of the Patents.  In performing under the Agreement, W&P's detrimental reliance on Sirius's material misrepresentations caused W&P to incur monetary damage by paying a substantial upfront fee and ongoing royalties to license from Sirius the Patents that are invalid, do not cover the distributed product, and at least a portion of which are not owned by Sirius.

91.     Upon information and belief, Covelli committed the tort of civil conspiracy with Sirius, Simons, and potentially others by: (1) combining or agreeing with a common purpose to commit an unlawful act or do an otherwise lawful act by unlawful means, through the purported licensing to W&P of the Patents not actually owned by Sirius, the purported licensing of patents that do not cover the product to be distributed in accordance with the Agreement, and the licensing of invalid patents procured by fraud; (2) committing the overt act in furtherance of the common purpose, through the misrepresentation to W&P of the ownership, validity, and scope of the Patents, the purported licensing to W&P of the Patents in the Agreement, and the withholding of material art from the U.S.P.T.O. to achieve the purpose of issuance of the fraudulent patents; and (3) causing W&P to incur actual damages, including monetary damages of the substantial upfront fee and ongoing royalties to license from Sirius the Patents that were obtained fraudulently, do not cover the scope of the distributed product, and at least a portion of which are not actually owned by Sirius.

## Count V – Tortious Interference with Contractual Relations by Covelli

92.     W&P repeats and re-alleges each of the foregoing allegations as though fully set forth herein.

93.     The Agreement between W&P and Sirius is a contract and forms the basis of a contractual relationship between W&P and Sirius.

94.     Covelli, being CEO of Sirius, knew of the Agreement.  As a member and owner of Sirius Signal, L.L.C., Covelli is not an employee of Sirius, Covelli is distinct from the legal entity Sirius Signal, L.L.C., and Covelli has used Sirius to act as Covelli's agent in conduct described herein.

95.     Covelli, as an individual and through the intentional and improper actions described above with respect to at least EMLinQ and Customer A, has interfered with W&P's contractual relations with Sirius by impairing W&P's ability to exclusively manufacture and sell the Licensed Products under the Agreement in order to obtain the benefits of the Agreement.

96.     Covelli, as an individual and through the intentional and improper actions described above with respect to at least Orion, has interfered with W&P's contractual relations with Sirius by impairing W&P's ability to exercise W&P's Exclusive Rights under the Agreement in order to obtain the benefits of the Agreement.  W&P's ability to exercise W&P's exclusive right has been impaired by Covelli licensing to a third party the Patents owned by Covelli, engaging in a civil conspiracy with Orion to undermine W&P's Exclusive Rights under the Agreement, and not taking diligent steps to enforce against a third party the Patent owned by Covelli.

97.     Covelli committed tortious interference with W&P's contractual relations inasmuch as (1) W&P had beneficial contractual relations with at least Customer A, EMLinQ and Sirius, (2) Covelli knew of W&P's beneficial contractual relations, (3) Covelli intended to impair, cause a detriment to, or cause a breach of W&P's contractual relations, (4) Covelli lacked any privilege to impair, cause a detriment to, or cause a breach of W&P's contractual relations, (5) Covelli impaired, caused a detriment to, and/or caused a breach of W&P's contractual relations, and (6) Covelli's actions caused damage to W&P.

98.     Due to Covelli's actions as an individual described above, W&P has been impaired in W&P's ability to obtain the full benefits of the Agreement by being unable to reliably and predictability manufacture or sell Licensed Products.

99.     W&P's reputation and goodwill have been damaged by Covelli's actions.

100.     Covelli's tortious actions have damaged W&P financially in an amount exceeding $75,000.

## Count V – Fraud by Covelli

101.     W&P repeats and re-alleges each of the foregoing allegations as though fully set forth herein.

102.     Upon information and belief, Covelli knew that Sirius did not own at least a portion of the Patents covered in the Agreement during the term of the Agreement and intentionally misrepresented to W&P that Sirius owned all of the Patents.

103.     Upon information and belief, Covelli knew and intentionally misrepresented to W&P that the product to be licensed and sold pursuant to the Agreement, the C-1001, was patented.

104.     Upon information and belief,  Covelli knew and intentionally misrepresented to W&P that it should falsely mark the products with the numbers of patents that did not cover the product.

105.     Upon information and belief, Covelli knew and intentionally misrepresented to W&P that patents obtained, owned, and/or claimed to be owned by Sirius were valid when, in fact, he knew that they were invalid due to fraud, inequitable conduct, and violation of the duty to disclose material art to the USPTO.

106.     Upon information and belief, co-inventors Covelli and Simons were both aware of the duty to provide all relevant material art to the USPTO, and both inventors signed a declaration that they would do so, and in violation of that declaration, both inventors intentionally failed to disclose at least U.S. Patent No. 6,168,288 to the U.S.P.T.O.

107.    In executing the Agreement, W&P reasonably and detrimentally relied on Covelli's intentional misrepresentation of these material facts relating to the scope, validity, and ownership of the Patents.  In performing under the Agreement, W&P's detrimental reliance on Covelli's material misrepresentations caused W&P to incur monetary damage by paying a substantial upfront fee and ongoing royalties to license from Sirius the Patents that are invalid, do not cover the product distributed under the Agreement, and a portion of which are not actually owned by Sirius, but rather actually are co-owned by Covelli.

108.    Upon information and belief, Covelli committed the tort of fraud, fraudulent inducement, and/or fraudulent misrepresentation, by: (1) intentionally misrepresenting to W&P the validy, scope, and ownership of the Patents in the Agreement; (2) knowing that misrepresentation was untrue; (3) intending to cause W&P to believe the misrepresentation; (4) leading to W&P to reasonably rely on the misrepresentation in W&P executing the Agreement and purportedly licensing the invalid Patents, some of which were not actually owned by Sirius; and (5) causing W&P to incur actual damages, including monetary damages of the substantial upfront fee and ongoing royalties to license from Sirius the Patents that are invalid, do not cover the product distributed under the Agreement, and a portion of which are actually are not owned by Sirius, but rather actually are co-owned by Covelli.

109.    Upon information and belief, Covelli led W&P to believe that the product being licensed to W&P by Sirius during the negotiations of the Agreement (i.e., model C-1001), was a patented product and that the Patents were owned by Sirius.  In particular, Covelli led W&P to believe that Sirius's product was covered by U.S. Patent D720247 and U.S. Patents 6168288 and 9,171,436, when in fact that was not true.  The design patent D720247 bears little resemblance to Sirius's product, the model C-1001 later sold by W&P.  Indeed, Covelli tacitly acknowledged

this lack of resemblance by later filing a new design patent application that issued as U.S. Patent D784175, which does resemble Sirius's product C-1001.  Similarly, at the time that Covelli made the misrepresentation to W&P regarding U.S. Patent 6168288, U.S. Patent 6168288 did not cover anything because it had expired on January 28, 2013, for failure to pay maintenance fees, so U.S. Patent 6168288 should not have been mentioned on the product packaging.  Moreover, neither Sirius nor Covelli owned U.S. Patent 6168288 at the time, and it wasn't included in the Agreement. Further, U.S. Patent 9171436 did not pertain to the C-1001 product to be sold in accordance with the Agreement because all of the claims require a "floodable lower compartment."  The C-1001 never included any floodable compartment, lower or otherwise, and still does not include such a compartment.

110.    Upon information and belief, Covelli committed the tort of fraud, fraudulent inducement, and/or fraudulent misrepresentation, by: (1) intentionally misrepresenting to W&P the validity and patent coverage of Sirius's products to be sold by W&P under the Agreement, and the ownership and inclusion of such in the Patents identified in the Agreement; (2) knowing that misrepresentation was untrue; (3) intending to cause W&P to believe the misrepresentation; (4) leading to W&P to reasonably rely on the misrepresentation in W&P executing the Agreement and purportedly licensing the Patents not actually owned by Sirius; and (5) causing W&P to incur actual damages, including monetary damages of the substantial upfront fee and ongoing royalties to license from Sirius the Patents that actually are not owned by Sirius.

### Count VI – Promissory Estoppel by Covelli

111.    W&P repeats and re-alleges each of the foregoing allegations as though fully set forth herein.

112.     Covelli is liable to W&P for equitable remedies under the doctrine of promissory estoppel, because: (1) during negotiations of Agreement with W&P, (2) Covelli represented and promised that Sirius would be able to grant, and would grant, to W&P an exclusive license to the Patents under the Agreement; (3) W&P relied on Covelli's representations and promises in executing the Agreement and performing under the Agreement; (4) W&P's reliance was to W&P's detriment, including payments of the substantial upfront fee and ongoing royalties; (5) Covelli failed to uphold the representations and promises by failing to assign valid Patents having the necessary scope to cover the product distributed in accordance with the Agreement during the term of the Agreement, not being able to assign due to the invalidity and improper scope, and therefore not assigning, W&P the promised exclusive license to valid, enforceable, Patents having proper scope; and (6) it would be unfair, inequitable, and/or unconscionable for Covelli, as an owner, a member and the CEO of Sirius, to retain the benefits of the Agreement in view of Covelli's and Sirius's failures to uphold the representations and promises.

113.     Equitable remedies that the Court may award W&P include, but are not limited to, voiding the Agreement, modifying the Agreement, disgorging from Covelli and returning to W&P the substantial upfront fee paid for the exclusive license to the Patents, and disgorging from Covelli and returning to W&P the royalties paid by W&P for sales of the Licensed Products covered under the exclusive license to the Patents.

### Count VII – Unjust Enrichment by Covelli

114.     W&P repeats and re-alleges each of the foregoing allegations as though fully set forth herein.

115.     Covelli is liable to W&P for equitable remedies under the doctrine of unjust enrichment, because: (1) Covelli negotiated and executed on behalf of Sirius the Agreement with

W&P, in which Covelli represented to W&P that Sirius owned valid Patents having a scope that covered the product to be distributed in accordance with the Agreement and that Sirius purported to grant to W&P an exclusive license to the Patents, in exchange for a substantial upfront fee and ongoing royalties on sale of the Licensed Products; (2) Covelli, as an owner, a member and the CEO of Sirius, was unjustly enriched by the receipt from W&P of the substantial upfront fee and ongoing royalties on sale of the Licensed Products, because upon execution of the Agreement and since, Sirius did not own valid Patents having a scope that covered the product to be distributed in accordance with the Agreement and was not able to grant to W&P the exclusive license required under the Agreement in exchange for the substantial upfront fee and ongoing royalties on sale of the Licensed Products paid by W&P; and (3) it would be unfair, inequitable, and/or unconscionable for Covelli to benefit from the Agreement at the expense of, and detriment to W&P, which did not receive the bargained-for benefit of the exclusive license under the Agreement.

116.    Equitable remedies that the Court may award W&P include, but are not limited to, voiding the Agreement, modifying the Agreement, disgorging from Covelli and returning to W&P the substantial upfront fee paid for the exclusive license to the Patents, and disgorging from Covelli and returning to W&P the royalties paid by W&P for sales of the Licensed Products covered under the exclusive license to the Patents.

### Count VIII – Declaratory Judgment of Unenforceability of the Patents Due to Inequitable Conduct by Covelli

117.    W&P repeats and re-alleges each of the foregoing allegations as though fully set forth herein.

118.    Every patent applicant, inventor, and person or entity associated with the filing or prosecution of a U.S. patent application before the U.S.P.T.O. ("application participants") has a

statutory duty of disclosure and duty of candor and good faith in prosecuting said patent application.  Federal Regulation 37 CFR §1.56 states, "Each individual associated with the filing and prosecution of a patent application has a duty of candor and good faith in dealing with the Office, which includes a duty to disclose to the Office all information known to that individual to be material to patentability as defined in this section. The duty to disclose information exists with respect to each pending claim until the claim is cancelled or withdrawn from consideration, or the application becomes abandoned."

119.    Accordingly, said application participants are required to disclose to the U.S.P.T.O. any material, non-cumulative prior art reference that is known to the application participant and is relevant to the patentability of a claim of a pending patent application in which the application participant is participating.

120.    Failure to disclose a known, material, non-cumulative prior art reference that "compels a conclusion that a claim is unpatentable" (37 CFR §1.56(b)) may be interpreted as a knowing and intentional failure to disclose with the intent to deceive the U.S.P.T.O. where the evidence shows that individual associated with the application suspected that the reference might render a claim unpatentable, but chose to not disclose the reference nonetheless.

121.    As the Court of Appeals for the Federal Circuit stated in *Therasense, Inc. v. Becton, Dickinson and Company*, 649 F.3d 1276 (Fed. Cir. 2011) (*en banc*), "Inequitable conduct is an equitable defense to patent infringement that, if proved, bars enforcement of a patent," making the entire patent unenforceable against anyone. "Direct evidence of intent [to deceive] is not, however, required," the Federal Circuit's decision reads. "A court may infer intent from circumstantial evidence."

122.    Upon information and belief, Covelli, the CEO of Sirius and the co-inventor of the Patents under the Agreement, knew, and therefore Sirius knew, at least as early as December 18, 2015, of U.S. Patent 6,168,288 assigned to Tektite Industries, Inc.

123.    Upon information and belief, Covelli knew, and therefore Sirius knew, at least as early as December 18, 2015, that U.S. Patent 6,168,288 was material to the patentability of the model C-1001 Licensed Product.

124.    Upon information and belief, Covelli believed, and therefore Sirius believed, at least as early as December 18, 2015, that U.S. Patent 6,168,288 was relevant to or covered the model C-1001 Licensed Product.

125.    Upon information and belief, Covelli informed, and therefore Sirius informed, W&P's former President, Peter Trogdon, in writing on December 18, 2015, prior to execution of the Agreement, that U.S. Patent 6,168,288 was relevant to, or covered the model C-1001.

126.    Upon information and belief, neither Covelli nor Sirius informed Trogdon or W&P prior to execution of the Agreement that neither Covelli nor Sirius owned U.S. Patent 6,168,288.

127.    Upon information and belief, neither Covelli nor Sirius informed Trogdon or W&P after execution of the Agreement that neither Covelli nor Sirius owned U.S. Patent 6,168,288.

128.    Upon information and belief, neither Covelli nor Sirius ever informed Trogdon or W&P that U.S. Patent 6,168,288 had expired January 02, 2013, for non-payment of maintenance fees.

129.    Upon information and belief, Covelli and Sirius included, at least as early as December 18, 2015, U.S. Patent 6,168,288 on the product labeling for the model C-1001 to mark

the product as patented, even though neither Covelli nor Sirius owned U.S. Patent 6,168,288 and it had expired January 02, 2013, for non-payment of maintenance fees.

130.    Upon information and belief, neither Covelli nor Sirius disclosed U.S. Patent 6,168,288 to the U.S.P.T.O. during the prosecution of any of patent applications on which Covelli is listed as an inventor and were directed to the Licensed Products, including model C-1001.

131.    Upon information and belief, Covelli and Sirius, with the intent to deceive, intentionally withheld and intentionally failed to disclose U.S. Patent 6,168,288 to the U.S.P.T.O. during the prosecution of any of patent applications on which Covelli is listed as an inventor and were directed to the Licensed Products, including model C-1001.

132.    Upon information and belief, Sirius and Covelli committed inequitable conduct and/or fraud on the U.S.P.T.O. in and during prosecution of at least one of the patent applications associated with the Patents, by: (1) knowing of at least one material, non-cumulative prior art reference, (2) failing to disclose the reference to the U.S.P.T.O. during prosecution of said patent application, and (3) breaching the duty of disclosure and the duty of candor and good faith during prosecution of said patent application by said failure to disclose involving a material misstatement or omission with intent to deceive. As a consequence of Sirius's aforementioned inequitable conduct and/or fraud on the U.S.P.T.O., said patent application and any resulting patent issued therefrom are unenforceable.

133.    Unenforceability of a patent due to inequitable conduct is a complete affirmative defense to any allegation of infringement of a patent held to be unenforceable. *See Therasense, Inc. v. Becton, Dickinson and Company*, 649 F.3d 1276 (Fed. Cir. 2011) (*en banc*).

72

134.     W&P requests a declaration that said patent application and any resulting patent issued therefrom, in which Covelli and Sirius intentionally failed to disclose U.S. Patent 6,168,288, are unenforceable, and that W&P therefore cannot infringe any of the patents or patent applications held to be unenforceable, because such patents or patent applications are unenforceable.

### Count IX – Declaratory Judgment of Invalidity of the Patents held by Covelli

135.     W&P repeats and re-alleges each of the foregoing allegations as though fully set forth herein.

136.     Upon information and belief, Covelli knew, and therefore Sirius knew, at least as early as December 18, 2015, that U.S. Patent 6,168,288 was material to the patentability of the model C-1001 Licensed Product.

137.     Upon information and belief, neither Covelli nor Sirius disclosed U.S. Patent 6,168,288 to the U.S.P.T.O. during the prosecution of any of patent applications on which Covelli is listed as an inventor and were directed to the Licensed Products, including model C-1001.

138.     W&P requests a declaration that said patent application and any resulting patent issued therefrom, in which Covelli and Sirius failed to disclose U.S. Patent 6,168,288, and in which U.S. Patent 6,168,288 is material to the patentability of the issued claims, are invalid as either anticipated by U.S. Patent 6,168,288, or obvious in view of U.S. Patent 6,168,288 and other related prior art.

139.     Invalidity of a patent due to unpatentability is a complete affirmative defense to any allegation of infringement of a patent held to be invalid.

140.     W&P requests a declaration that W&P therefore cannot infringe any of Sirius's patents or patent applications held to be invalid, because such patents or patent applications are invalid.

## Count X – False Patent Marking by Covelli

141.     W&P repeats and re-alleges each of the foregoing allegations as though fully set forth herein.

### U.S. Patent D720247

142.     False patent marking statute 35 U.S.C. §292(a) criminalizes false marking of products with patent information, including, "Whoever marks upon, or affixes to, or uses in advertising in connection with any unpatented article, the word "patent" or any word or number importing that the same is patented, for the purpose of deceiving the public; … Shall be fined not more than $500 for every such offense."  Subsection (b) provides, "A person who has suffered a competitive injury as a result of a violation of this section may file a civil action in a district court of the United States for recovery of damages adequate to compensate for the injury."

143.     Upon information and belief, Covelli and Sirius included, at least as early as December 18, 2015, U.S. Patent D720247 on the product labeling for the model C-1001 to mark the product as patented, even though U.S. Patent D720247 clearly did not cover or patent the model C-1001 product.

144.     Upon information and belief, Covelli informed, and therefore Sirius informed, W&P and W&P's former President, Peter Trogdon, in writing on December 18, 2015, prior to execution of the Agreement, that U.S. Patent D720247 covered the model C-1001 and was included in the product labeling of model C-1001.

145.     Upon information and belief, Covelli and Sirius deceived the public in general, and W&P in particular, that model C-1001 was a patented product covered by U.S. D720247, in violation of 35 U.S.C. §292(a).

146.     Upon information and belief, W&P was fraudulently induced into executing the Agreement based on the willfully false misrepresentations of Covelli and Sirius that model C-1001 and the Licensed Products were patented and covered by at least U.S. Patent D720247.

147.     Upon information and belief, W&P suffered a competitive injury under 35 U.S.C. §292(b) as a result of Covelli's and Sirius's violation of 35 U.S.C. §292(a), inasmuch as Covelli's and Sirius's violation of 35 U.S.C. §292(a) fraudulently induced W&P to execute the Agreement to obtain an exclusive license to the Patents, for which W&P paid a substantial upfront fee and ongoing royalties based in part on the detrimental reliance on Covelli's and Sirius's misrepresentation that model C-1001 was patented and covered by at least U.S. Patent D720247.

**U.S. Patent 9171436**

148.     Upon information and belief, Covelli and Sirius included, possibly as early as October 27, 2015, U.S. Patent 9171436 on the product packaging or labeling for the model C-1001 to mark the product as patented, even though U.S. Patent 9171436 clearly did not cover or patent the model C-1001 product.

149.     Upon information and belief, possibly as early as October 27, 2015, Covelli informed, and therefore Sirius informed, W&P and W&P's former President, Peter Trogdon that U.S. Patent 9171436 covered the model C-1001 and was included in the product packaging or labeling of model C-1001.

150.    Upon information and belief, Covelli and Sirius deceived the public in general, and W&P in particular, that model C-1001 was a patented product covered by U.S. 9171436, in violation of 35 U.S.C. §292(a).

151.    Upon information and belief, W&P was fraudulently induced into executing or performing the Agreement based on the willfully false misrepresentations of Covelli and Sirius that model C-1001 and the Licensed Products were patented and covered by U.S. Patent 9171436.

152.    Upon information and belief, W&P suffered a competitive injury under 35 U.S.C. §292(b) as a result of Covelli's and Sirius's violation of 35 U.S.C. §292(a), inasmuch as Covelli's and Sirius's violation of 35 U.S.C. §292(a) fraudulently induced W&P to execute or perform the Agreement to obtain an exclusive license to the Patents, for which W&P paid a substantial upfront fee and ongoing royalties based in part on the detrimental reliance on Covelli's and Sirius's misrepresentation that model C-1001 was patented and covered by at least U.S. Patent 9171436.

## PRAYER FOR RELIEF AGAINST COVELLI

WHEREFORE, W&P prays for the following:

**Primary Set of Prayers for Relief:**

A.    An order declaring each patent Assignment to "Sirius Signal Co." null and void;

B.    An order declaring the Agreement null and void;

C.    An order requiring Covelli to repay to W&P the substantial upfront fee and all royalties paid by W&P to date, including those held in the court's registry;

D.    An order declaring that the patents are unenforceable due to the inequitable conduct of Covelli and Sirius;

E.    An order declaring that the patents are invalid due to the unpatentability of claims for which U.S. Patent 6,168,288 is material to patentability, in view of U.S. Patent 6,168,288 not disclosed by Covelli or Sirius during patent prosecution;

F.    An order declaring that W&P suffered a competitive injury due to Covelli's and Sirius's false patent marking, and compensating W&P accordingly;

G.    An order requiring Covelli to indemnify W&P for any liability for infringement of any future patents issued to Sirius or Covelli;

H.    An order requiring Covelli to pay compensation for its unjust enrichment;

I.    An order requiring Covelli to cease its unfair competition and tortious interference with the business relations and contracts of W&P and to pay compensation to W&P for its lost sales and other damages caused by same;

J.    An order requiring Covelli to pay compensation for the damage to the reputation of W&P;

K.    An award to W&P of compensatory and punitive damages;

L.    An award to W&P of interests, costs, and attorneys' fees; and

M.    Such further relief as this Court may deem just and equitable.

**Secondary Set of Prayers for Relief:**

In the event that the Court decides not to follow the Primary Set of Prayers for Relief by virtue of deciding that the Agreement will not be held null and void, W&P prays that the Court follow this Secondary Set of Prayers for Relief that includes the following:

A.    An order declaring each patent Assignment to "Sirius Signal Co." null and void;

B.      An order that Covelli breached the Agreement;

C.      An order that Covelli was unjustly enriched by the Agreement;

D.      An order requiring Covelli to repay to W&P the substantial upfront fee and all royalties paid by W&P to date, including those held in the court's registry;

E.      An order declaring that the patents are unenforceable due to the inequitable conduct of Covelli and Sirius;

F.      An order declaring that the patents are invalid due to the unpatentability of claims for which U.S. Patent 6,168,288 is material to patentability, in view of U.S. Patent 6,168,288 not disclosed by Covelli or Sirius during patent prosecution;

G.      An order declaring that W&P suffered a competitive injury due to Covelli's and Sirius's false patent marking, and compensating W&P accordingly;

H.      An order indemnifying W&P for any liability for infringement of any future patents issued to Sirius or Covelli;

I.      An order requiring Covelli to have the ownership of the Patents properly assigned to Sirius Signal, L.L.C.;

J.      An order prohibiting Covelli from licensing, or arranging for Sirius to license, the Patents to any third party, and prohibiting Covelli from agreeing, or arranging for Sirius to agree, with any third party that Covelli or Sirius will not seek to enforce the Patents against the third party;

K.      An order requiring Covelli to assert, or arrange for Sirius to assert, any of the Patents not held to be unenforceable or invalid, against any third party appearing to infringe the Patents;

L.     An order requiring Covelli to cease his unfair competition and tortious interference with the business relations and contracts of W&P and to pay compensation to W&P for its lost sales and other damages caused by same;

M.     An order requiring Covelli to pay compensation for its unjust enrichment;

N.     An order requiring Covelli to pay compensation for the damage to the reputation of W&P;

O.     An award to W&P of compensatory and punitive damages;

P.     An award to W&P of interests, costs, and attorneys' fees; and

Q.     Such further relief as this Court may deem just and equitable.

**<ins>Tertiary Set of Prayers for Relief:</ins>**

In the event that the Court decides not to follow the Primary Set of Prayers for Relief by virtue of deciding that the Agreement will not be held null and void and the Secondary Set of Prayers for Relief by virtue of deciding that Covelli was not unjustly enriched, W&P prays that the Court follow this Tertiary Set of Prayers for Relief that includes the following:

A.     An order declaring each patent Assignment to "Sirius Signal Co." null and void;

B.     An order that Covelli breached the Agreement;

C.     An order declaring that the patents are unenforceable due to the inequitable conduct of Covelli and Sirius;

D.     An order declaring that the patents are invalid due to the unpatentability of claims for which U.S. Patent 6,168,288 is material to patentability, in view of U.S. Patent 6,168,288 not disclosed by Covelli or Sirius during patent prosecution;

E.     An order declaring that W&P suffered a competitive injury due to Covelli's and Sirius's false patent marking, and compensating W&P accordingly;

F.     An order indemnifying W&P for any liability for infringement of any future patents issued to Sirius or Covelli;

G.     An order requiring Covelli to have the ownership of the Patents properly assigned to Sirius Signal, L.L.C.;

H.     An order prohibiting Covelli from licensing, or arranging for Sirius to license, the Patents to any third party, and prohibiting Covelli from agreeing, or arranging for Sirius to agree, with any third party that Covelli or Sirius will not seek to enforce the Patents against the third party;

I.     An order requiring Covelli to assert, or arrange for Sirius to assert, any of the Patents not held to be unenforceable or invalid, against any third party appearing to infringe the Patents;

J.     An order requiring Covelli to cease its unfair competition and tortious interference with the business relations and contracts of W&P and to pay compensation to Sirius for its lost sales and other damages caused by same;

K.     An order requiring Covelli to pay compensation for his breach of the Agreement;

L.     An order requiring Covelli to pay compensation for the damage to the reputation of W&P;

M.     An award to W&P of compensatory and punitive damages;

N.     An award to W&P of interests, costs, and attorneys' fees; and

O.     Such further relief as this Court may deem just and equitable.

## **REQUEST FOR JURY TRIAL**

W&P hereby requests a jury trial on all issues so triable.

Respectfully submitted,

Dated:  January 2, 2020          /s/ Timothy F. Maloney
Timothy F. Maloney (Fed. Bar ID #03381)
Alyse L. Prawde (Fed. Bar ID #14676)
JOSEPH, GREENWALD & LAAKE, P.A.
6404 Ivy Lane, Suite 400
Greenbelt, Maryland 20770
(301) 220-2200 (tel.)
aprawde@jgllaw.com

Rita C. Chipperson, Esq.
Kevin M. Curran, Esq.
CHIPPERSON LAW GROUP, P.C.
163 Madison Avenue
Suite 220-40
Morristown, NJ 07960
(973) 845-9071 (tel.)
rcc@chippersonlaw.com
kmc@chippersonlaw.com

*Counsel for Defendant/Counter-*
*Plaintiff/Third-Party Plaintiff*
*Weems & Plath, LLC.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, pursuant to U.S. District Court of Maryland Local Rule 102(1)(c), the foregoing was filed electronically through the CM/ECF system providing notice to all counsel of record on the date filed, as required by Fed. R. Civ. P. 5(a).

<u>/s/ Alyse L. Prawde</u>
Alyse L. Prawde